[Civ. No. 52614. Second Dist., Div. Five. Nov. 1, 1978.]

PACIFIC OUTDOOR ADVERTISING COMPANY,
Plaintiff and Appellant, v.
CITY OF BURBANK, Defendant and Respondent.

**COUNSEL**

Thomas G. Baggot for Plaintiff and Appellant.

Samuel Gorlick, City Attorney, and Huston T. Carlyle, Jr., Assistant City Attorney, for Defendant and Respondent.

**OPINION**

**STEPHENS, J.**—This appeal is taken from a judgment in favor of the City of Burbank (hereinafter Burbank) on the issue of its liability in an

alleged inverse condemnation action brought by plaintiff-appellant Pacific Outdoor Advertising Company (hereinafter Pacific). The principal issue was whether Burbank was liable for allegedly inversely condemning Pacific's six outdoor advertising structures by "inducing" the termination of Pacific's lease regarding said structures in its dealings with a third party from whom Burbank wished to lease the land upon which the signs were located. The judge below, presiding without a jury, found that plaintiff-appellant had no cause of action against Burbank for inverse condemnation. We affirm.

### FACTS

Pacific had entered into two agreements with the Southern Pacific Company (hereinafter Railroad), one dated November 15, 1957, and the second dated April 13, 1960. Each provided that Pacific could erect and maintain two outdoor illuminated advertising panels (10 × 25 feet) on the Railroad's right of way. The latter agreement was subsequently amended to allow for the installation of two additional panels (10 × 25 feet), thus making a total of six outdoor advertising structures.[1]

Defendant-respondent Burbank, in the latter part of 1972 and during the year of 1973, became interested in leasing some of the Railroad's property for the purpose of beautification and paving certain other portions of said property for the purpose of providing off-street parking.[2] Negotiations to that end began in late 1973. Defendant and the Railroad concluded such negotiations by entering into a lease dated January 29, 1974, whereby Burbank leased a portion of the Railroad's right of way.

The signs erected by Pacific were located on the right of way leased to Burbank, and accrued to the Railroad an annual rental fee of $324. Pacific's agreements with the Railroad contained provisions making such licenses terminable on a 24-hour notice by the Railroad, and subsequent to a request by Burbank that the Railroad terminate all such leases (8 or more) on the right of way in question, the Railroad sent a letter to

---

[1] These structures were each built to code and were constructed of steel beams embedded in the ground with a sign facing attached to the steel beams and a steel deck. The facing were made of fiberglass molding and durable plywood.

[2] Said parking was to be subleased by the city and the rental paid to the Railroad. The initial parking under the lease consisted of 333 spaces for which the Railroad was to receive $3 per space per month with other spaces to be provided as additional paving could be completed by the respondent, for a total annual payment to the Railroad of $11,988 for all property leased.

plaintiff dated January 23, 1974, stating that it was negotiating a lease with the city of Burbank, notifying Pacific that it would request termination of their agreement regarding the signs. Such notifications and subsequent cancellations were all proper within the provisions of the licenses. The Railroad cancelled plaintiff-appellant's licenses effective February 28, 1974. Pacific thereupon accepted the termination of its license agreements, not attempting to negotiate any further arrangements with the Railroad to forestall such termination.[3] The sign structures —having a remaining service life of approximately 35 years—were subsequently placed by the plaintiff into its inventory. Although there was testimony that the Railroad would not have terminated said leases until it had a firm agreement with the city, it was found that at no time did Burbank ever threaten or mention that unless a lease was entered into, it would condemn the subject property of the lease.

It is also of note that the lease in question was of a greater benefit to the Railroad than its current licenses with various other entities, including the appellant. The lease arrangement with Burbank gave the Railroad numerous benefits: (a) $11,988 per annum from parking as against approximately $9,000 for all leases and licenses relative to the same property prior to consummating the lease with respondent (there were approximately eight to ten leases in existence relative to the same property prior to the lease granted Burbank), (b) beautification of the Railroad's property—including plants, shrubs, an underground sprinkling system and undergrounding by Burbank of all the Railroad's signal and electrical lines—in the amount of approximately $180,000, with the defendant providing both maintenance and policing of said property, and (c) all previous parking leases were consolidated into one lease, thus reducing the Railroad's administrative burden.

The trial court found, in light of the above factors, that the Railroad had selectively terminated its license arrangement with appellant in order to derive more income as well as other benefits under a substantially better financial arrangement with the respondent. And finally concluded that the entire transaction between the Railroad and defendant was an "open market transaction" in that there was never a threat to institute

---

[3]In accord with the appellant's license agreements, it demanded and received from the Railroad its unused rental for the remainder of the year. And in December of 1975 and January 1976, approximately two years after it received its termination notice, plaintiff removed its signs. Upon receipt of the termination notices, the aforementioned is the only action that appellant took: to invoice the Railroad for unearned rental paid and finally, two years later, to remove the signs in question.

condemnation proceedings with the Railroad. The lower court further concluded that defendant's negotiations were not the proximate cause of the Railroad's termination of appellant's license agreements since the Railroad had acted freely in its own interest. It is also of note that the Railroad was cognizant of the fact that the city, in entering this long term lease, had the intention of constructing additional parking spaces, which in turn would mean more revenue for the Railroad.

Lastly, with regard to the question of whether the Railroad acted under some real or threatened or implied compulsion, it is of note that not all of the demands of Burbank were met by the Railroad. Burbank wanted a 50-year lease but the Railroad only granted a 25-year lease. The city also wanted at least a one-year minimum cancellation but was only granted one for six months. And nowhere is there found a clause in the lease saying that the Railroad would have to terminate the other leases existing on the same property. Thus, in light of these refusals, the Railroad and the City of Burbank apparently had an equal bargaining position.

■ We begin by noting that the principles which affect the rights of the parties in an inverse condemnation action are generally the same as those in an eminent domain proceeding. (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343 [144 P.2d 818]; *Rose* v. *State of California* (1942) 19 Cal.2d 713 [123 P.2d 505].) Article I, section 19, of the California Constitution provides that where a public entity takes or damages private property for public use, just compensation must first be paid the owner. It has been noted that this provision requires no statutory implementation, since it is self-executing. (*Rose* v. *State of California, supra.*) And this constitutional right to compensation exists although the facts would not have established a cause of action against a private defendant. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441]; *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129].)

■ ■ Plaintiff Pacific maintains that the decisions in *Concrete Service Co.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1969) 274 Cal.App.2d 142 [78 Cal.Rptr. 923] and *Redevelopment Agency* v. *Diamond Properties* (1969) 271 Cal.App.2d 315 [76 Cal.Rptr. 269], control the case at bar and require a reversal. Pacific argues that "[s]aid decisions establish the law in California that a public entity which acquires property for public use cannot avoid payment for improvements which are part of the realty by the device of causing the fee owner to terminate the improve-

ment owner's tenancy and cause the removal of said improvements without compensation." Both of the aforementioned cases are factually distinguishable from the present case, and neither supports the proposition proffered by appellant—that the right to condemn alone, is in and of itself sufficient for sustaining an action in inverse condemnation. In both cases there was something more—evidence of, or direct threat to condemn, precisely what the trial judge concluded was lacking in the case before us.

Diamond Properties operated a meat processing plant which it leased on a month-to-month basis. This plant was located in a nine-block area in Stockton regarding which the Redevelopment Agency had given notice to the owners and occupants that it intended to acquire said property by purchase *or by condemnation. (Redevelopment Agency* v. *Diamond Properties, supra,* 271 Cal.App.2d at p. 317.) Four years later the agency actually filed a complaint seeking to condemn property which included the interest of Diamond Properties. In negotiations thereafter with the owner of the property, the agency said it would purchase the property at an agreed price if she served a termination notice upon Diamond Properties. Such notice was served and respondent condemner subsequently acquired the interest of fee owner by grant deed and filed a written stipulation that the condemnation action be dismissed as to the owner of the property. It was upon these facts that the Court of Appeal held that the agency must pay for the improvements owned by Diamond Properties.

The issue in *Concrete Service Co.* v. *State of California, supra,* 274 Cal.App.2d 142, was stated by the court as being "whether a condemning authority, desiring to acquire real property for a public use, may avoid payment for personal property consisting of industrial equipment owned by a tenant, which is admittedly part of the realty for purposes of condemnation, by the device of an out-of-court purchase of the landlord-owner's fee followed by the authority's termination of the tenancy and demand for the land 'clear of all improvements.' " (*Id.,* at p. 144.)

Concrete had constructed a concrete batch plant on the property in question and was occupying the premises under a month-to-month tenancy. Before learning of said tenancy, the Department of Public Works advised Concrete, by letter, that "the demands of a freeway right-of-way required removal of all improvements on the land." (*Id.,* at p. 145.) Agents of the department subsequently came upon the property

and requested and received permission to appraise the batch plant for the "purpose of condemnation." After the department learned of the month-to-month tenancy, however, it entered into private negotiations with Concrete's landlord, which ended in a sale of the land to the State of California. The department thereafter sent a "Landlord's Notice of Termination" of the tenancy to Concrete, demanding delivery of the land free of all improvements. Concrete acceded to the demand, clearing the property. (*Id.*, at p. 145.)

In granting relief for the plaintiff in an action for inverse condemnation, the court concluded—in light of the fact that the department "unequivocally expressed its intention to take the subject property for freeway purposes. . . . [and] then appraised the plant's equipment for the 'purpose of condemnation.' . . . that the Department acquired the real property in question, *not as a result of bargaining in the open market*, but rather in the broad exercise of its power to condemn private property for public use." (*Id.*, at p. 147. Italics added.)

Neither was the taking effectuated in *Diamond Properties* the result of bargaining in the open market. For in that case, as previously stated, not only was notice given by the agency that it intended to acquire the property by purchase or *condemnation*, but the agency actually filed a complaint seeking to condemn said property, prior to its negotiations with the landlord.

Contrary to the assertion of appellant, the actions of defendant-appellant Burbank, in the case at bar, are *not* the equivalent of the actions of the Stockton Redevelopment Agency, nor of those of the State Highway Department in *Concrete Service.*

In both *Diamond Properties* and *Concrete Service* there is a definite and unequivocal manifestation that the public entity in question was ready to use its power to condemn, and in fact would clearly do so if necessary, to acquire the property at issue. Not only has Pacific failed to establish such a "calculated attempt" by Burbank, but all evidence is to the contrary. The personal property of Pacific was neither taken nor damaged by the respondent. The Railroad terminated the licenses held by the appellant, and it did so solely upon the motive of financial and other benefits which it foresaw as a result of leasing the said property to Burbank. Lacking an intent, or even an indication to condemn, the city was dealing in an open market transaction with the Railroad, and we are not ready to hold that a

public entity is always liable for damages in an inverse condemnation suit when it concludes transactions in the open market. Pacific's reliance upon the aforementioned cases is inapposite as noted in respondent's brief: "even though the damage or taking was under the guise of the 'open market transaction,' it was in fact just the opposite because there was the imminent threat of condemnation by virtue of a resolution having been passed by the Council [*Concrete Service*] or by virtue of an actual condemnation proceeding having been instituted [*Diamond Properties*]."

It is a very different situation when a private party (Railroad) terminates a license as an inducement to a public entity (Burbank) to enter into a lease of its property. Moreover, as pointed out by counsel for respondent, "the Railroad retained the right to terminate the City's interest whenever it so desired." The mere fact that respondent has the power of eminent domain, when in fact such power is neither exercised nor remotely threatened, is insufficient to render it liable in an inverse condemnation action every time it deals in an open market transaction which results in leases or licenses being broken. The "power to condemn" cannot in and of itself constitute proximate cause where there is an intervening force or factor. In an open market transaction the "power to condemn" is not enough—there must be evidence of implied or actual threat of condemnation, so that the ultimate result is a foregone conclusion.[4] This is the test the trial judge used, and contrary to Pacific's contentions, it is not incorrect as a matter of law. It is a mixed question of law and fact as to whether or not the termination in question occurred "in the broad exercise of the power to condemn private property for public use," or in the context of an open market transaction.

Finally, Pacific cites a number of cases which resulted in inverse condemnation without the public entity in question threatening condemnation (i.e., *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296; *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250; *Bacich* v. *Board of Control, supra,* 23 Cal.2d 343; *Rose* v. *State of California, supra,* 19 Cal.2d 713). These cases, however, are clearly distinguishable in that they involved "direct

---

[4]"THE COURT: I think that has to be shown in a case like this. It was at least likely there would be a condemnation. In other words, to have inverse condemnation, you have to have a taking. A transaction that a city has with an outside vendor is not necessarily a taking. Cities, like other bodies, municipal and corporate, can do business without using their condemnation power. If, for example, this property, as I said, it was in the path of a bridge, or a freeway, or something else, which, although there was no resolution, it was inferrable from the circumstances that they were going to go forward with it anyway, no matter what would have happened, I would say your argument would apply, but we don't have that in the record."

damage" without any intervening force or factor. Pacific relies upon the following statement from the *Holtz* court: " 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' In other words, the underlying purpose of our constitutional provision in inverse —as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements' [citation] 'to socialize the burden . . . —to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society'. . . ."(*Holtz, supra,* 3 Cal.3d. at p. 303.) Pacific thereupon concludes that this principle of fairness applies directly to the case at bench, reasoning that since "[d]efendant City's parking project required the removal of [Pacific's] structures . . . [i]f [Pacific] is not compensated, [it] will have contributed more than its fair share of the cost of the public parking project."

The *Holtz* court, however, in clarifying this "loss distribution" premise which it first stated in *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, noted that the *Albers* test took into account the competing considerations "which caution against an open-ended, 'absolute liability' rule of inverse condemnation [as suggested by Pacific and] [r]ecognizing that 'fears have been expressed that compensation, allowed too liberally, will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost' [citation], . . ." the *Holtz* court limited its holding regarding inverse condemnation liability, absent fault, to " *'physical injuries of real property' that were 'proximately caused' by the improvement as deliberately constructed and planned."* (*Holtz, supra,* 3 Cal.3d at p. 304. Italics added.) The *Holtz* court clearly stated that this "policy inquiry [was focused] on situations which shared a general factual similarity with that present in *Albers*," and thus confined its holding to the limits suggested by the facts of that case: that is, "plaintiffs clearly allege[d] that they [had] suffered 'actual physical injuries of real property' and that such injuries 'were proximately caused by the excavation and construction work . . . [as] deliberately designed and constructed by defendants. . . .' " (*Id.,* at p. 304.) The court concluded its analysis of the basic purpose behind. California Constitution article I, section 14, by stating that it "[had] no occasion in the instant case to analyze the operation of [this section] beyond the limits suggested by the facts of *Albers*; . . ." (*Id.*)

*Albers* involved an action to recover damages to private real property which resulted from a landslide caused by county road construction, and

*Holtz* involved lateral and subjacent support damage to private property (settling and cracking of plaintiff's buildings) arising out of excavation work by defendant rapid transit district in connection with its construction of an underground rapid transit system. It was within this limited factual context that the California Supreme Court concluded that "physical damages proximately resulting from a public improvement must be considered as direct a 'cost' as the property actually condemned or the materials actually utilized in its construction." (*Holtz, supra,* at p. 310.) The damage in both cases, unlike that in the case at bar, was immediate and direct, and therefore there was no question that it was the proximate result of the public improvement. Moreover, the existence of an affirmative, intentional and unequivocal act on the part of the public entity in question was not in issue.

In an open market transaction, however, absent an unequivocal act or intent to condemn if necessary, we hold that the "power to condemn," does not in and of itself constitute proximate cause. And the competing policy consideration of the possibility of impeding or stopping beneficial public improvements because of greatly increased costs takes precedent. Consequently, the trial court's insistence of a showing by appellant that there existed some degree of actual or implied threat of condemnation (at a minimum inferable from the circumstances), and its determination that respondent Burbank's conduct was not the proximate cause of appellant's loss were both relevant and not contrary to established law.

In light of the foregoing, we do not reach the issue of whether appellant's structures are "compensable property" with regard to an inverse condemnation suit.

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied November 28, 1978, and appellant's petition for a hearing by the Supreme Court was denied December 27, 1978.