[No. D029645. Fourth Dist., Div. One. June 17, 1999.]

SAN DIEGO METROPOLITAN TRANSIT DEVELOPMENT BOARD,
Plaintiff and Respondent, v.
HANDLERY HOTEL, INC., et al., Defendants and Appellants.

518

**COUNSEL**

Kathryn Reimann; and Susan S. Hinz for Defendants and Appellants.

Best, Best & Krieger, Bruce W. Beach and Shawn D. Hagerty for Plaintiff and Respondent.

**OPINION**

**WORK, J.**—Handlery Hotel, Inc.,[1] appeals a judgment pursuant to Code of Civil Procedure[2] section 631.8 in favor of San Diego Metropolitan Transit Development Board (MTDB) in a condemnation proceeding where the trial court held Handlery was not entitled to compensation for its claims for loss of its business of operating the now defunct Stardust Golf Course and for loss of goodwill, both allegedly the result of unreasonable precondemnation conduct by MTDB that caused the landowners not to renew on a long-term basis Handlery's lease of the 200-acre course parcel. Handlery presents multiple challenges to the trial court's decision. However, as we shall explain, we conclude the trial court correctly ruled no de facto or inverse taking of Handlery's golf course business occurred, because it had no

---

[1]Including Handlery Holding Company, Inc., Camino Del Rio Properties and Stardust Country Club (collectively Handlery).

[2]All undesignated statutory references are to the Code of Civil Procedure.

compensable property interest that was interfered with or taken and MTDB's precondemnation conduct was not unreasonable. Further, under the codified Eminent Domain Law (§ 1263.510), Handlery is not entitled to recover lost business goodwill. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Handlery Hotel in San Diego is a 217-room facility, with a swim and tennis club and a cinema, located on 15 acres of land Handlery owns in fee adjacent to Hotel Circle Drive North in Mission Valley.[3] Until June 30, 1994, Handlery held a long-term lease on the 200-acre golf course property, paying $500 per month and operating it out of its hotel facilities.[4] Handlery had developed and operated the 27-hole regulation course for more than 40 years at its own redundant expense. All the parking, access and amenities critical to operating the course were located on land owned by Handlery, as each nine-hole segment began and ended at the clubhouse located at the hotel site. However, all the tees, fairways or greens of the course were located on leased property.

The fee interest in the 200-acre golf course was owned equally by Chevron Corporation[5] and the Levi/Cushman families. In 1988, they formed a partnership known as Paseo Del Rio, Limited (PDR) to develop the property. Chevron acted as the general partner and sole source of capital and the Levi/Cushman families were limited partners. PDR paid between $2 million and $5 million per year for a 99-year ground lease for the property. Receiving only $500 per month in revenue from the long-term lease with Handlery, the arrangement resulted in an annual loss to Chevron of approximately $2.5 million.

The public project for which MTDB sought permanent and temporary easements in the golf course property was the development of the Mission

---

[3] Handlery also owns a physically separate five-acre parcel of floodway property located to the west of its hotel, at the western end of the old Stardust Golf Course.

[4] In 1956, Handlery purchased the controlling interest in the Camino Del Rio Properties, owners of a 50-year lease for the golf course property. The lease required Handlery to pay only $500 per month in rent plus property taxes; terminated on June 30, 1994, and did not contain a renewal provision; provided that all improvements constructed on the property reverted to the fee owners after the lease expired; and contained a condemnation clause allocating all proceeds of any condemnation award to the fee owners.

[5] During the 1980's, Chevron Corporation, through the Huntington Beach Company, purchased a one-half interest in the golf course for approximately $15 million. A separate Chevron entity, Chevron Land and Development Company, managed Chevron's interest in the property. Chevron Land and Development Company was until recently a property management and development company owned by Chevron Corporation (collectively, Chevron).

Valley West Light Rail Transit Extension. The project would extend the trolley 6.2 miles from Old Town to a point east of what is now Qualcomm Stadium. In late 1993, MTDB announced it would complete the project by the 1998 Super Bowl to be held at the stadium. That goal was met.

The part of the project at issue here is the Levi/Cushman or Riverwalk segment, which bisects the 200-acre property. Specifically, it cuts through the middle of the golf course on a large berm that is 30 feet in height in some places, but is compatible with the future development of the property as described in the Riverwalk Specific Plan (Riverwalk Plan).[6] By late 1992 and early 1993, the plan was on hold due to the recession.

In late 1992 when Chevron's development plans were unclear, Chevron and Handlery began negotiations for a new lease of the golf course pending ultimate development. During these early discussions, Chevron informed Handlery it wanted more control over the golf course. Chevron had explored ways of operating the course without Handlery and discussed the possibility of using a new operator or of reconstructing the course away from Handlery's facilities. In addition, Chevron advised Handlery it needed to maximize revenue from the course and anticipated between $1.2 million to $2 million in net profit from the course which it believed to be consistent with Handlery's past revenue from, and its future projections for, the course.[7] On September 20, 1993, Handlery provided Chevron with a written proposal for a 15-year lease to operate the course. Handlery proposed to pay $866,500 per year in rent, less $200,000 in property taxes to be paid by PDR, generating $666,500 in revenue to PDR. In November, Chevron rejected the proposal and informed Handlery it would not make a counteroffer because the parties were too far apart. In December, Chevron proposed a five-year management contract to Handlery. However, on January 11, 1994, Chevron informed Handlery it was pursuing other options and intended to reconstruct the course away from Handlery's facilities.

---

[6]Originally, the fee owners of the golf course parcel processed the Levi/Cushman Specific Plan for the development of the property, which entitled them to construct a large, mixed-used development including office buildings, hotel and residential units on the property. Between 1990 and 1992, Chevron, as the general partner of PDR, processed the Riverwalk amendment to the Levi/Cushman Specific Plan, with the intent of giving the plan more flexibility to respond to market conditions. Under either plan, PDR was required to dedicate all of the right-of-way for the trolley and construct all the river improvements had development occurred before construction of the trolley. Indeed, the Riverwalk Plan was specifically designed as a transit-oriented development, incorporating the trolley into its development plan.

[7]Handlery was also informed during the negotiations that, although it was negotiating with Chevron as the general partner of PDR, any deal had to be approved by the Levi/Cushman families.

Simultaneous with these negotiations, Chevron began discussions with MTDB regarding its project and its compatibility with the Riverwalk plan. Each party wanted the other to start development first, thus shifting the cost of certain trolley-related improvements to the initiating party. In other words, if MTDB went first, it would have to condemn the property and pay damages; if Chevron went first, it would have to dedicate property and waive damages. However, during 1993, concerned the Riverwalk plan was not going forward, MTDB proceeded to consider a "trolley-first" option. This scenario required MTDB to analyze the impact the trolley would have on the course, causing it to commence studying ways to reconstruct the course in a "like-for-like" manner leaving the property owners with a 27-hole regulation golf course. On Chevron's recommendation, MTDB hired Ted Robinson as the course architect, to prepare initial plans for a reconfigured course under the "trolley-first" option. These plans were oriented around the existing Handlery facilities.

In late 1993, after Robinson had completed his plans for MTDB, Chevron met with him and requested him to prepare plans for moving the location of the clubhouse away from Handlery property. A relocated clubhouse would provide Chevron with more flexibility.

By late 1993 and early 1994, Chevron had taken over the design of the reconfigured course; hired Robinson to assist in the plans for the new course; and envisioned a reconfigured course as a way to maximize income from the course and as a long-term solution to its problems regarding the property. By May 1994, Chevron had decided to relocate the clubhouse away from Handlery property. Upon learning of Chevron's plans and consistently thereafter, MTDB emphasized to Chevron that it would not be involved with relocating the clubhouse; that it would not pay for the relocation or an access road; and that Chevron/PDR would have to pay for the relocation. Nevertheless, Chevron elected to relocate the clubhouse and formally retained Robinson to prepare final plans to accomplish the task. Chevron's reconfigured course required an additional 15 acres of property not part of the original 200-acre course property. The additional fifteen acres included a portion of the five-acre property owned by Chevron and condemned by MTDB for its project, a portion of a parcel already owned by MTDB, and a portion of the five-acre property owned by Handlery.

During this time period, MTDB did not deal directly with Handlery because it knew the long-term lease was expiring and the property owners intended to take control of the course. However, in 1994, MTDB discovered

it needed to acquire Handlery's five-acre parcel for environmental mitigation, flood control and course reconfiguration.[8] Handlery received a notice of appraisal and an offer from MTDB to purchase the five-acre property. The parties met to discuss the project and the need for the acreage in February 1995. The following month, MTDB adopted a resolution of necessity to acquire the acreage from Handlery for the cited reasons. MTDB's action to condemn the parcel was filed later that month.[9]

In early 1994, after Handlery learned Chevron was not going to enter a new long-term lease with it, the parties negotiated a temporary, six-month lease to generate revenue from the course pending MTDB's development project. The new lease, effective on July 1, was constructed in light of MTDB's project, contained a condemnation clause and did not contain an automatic right of renewal. The parties negotiated several short-term extensions to the lease. These latter extensions were set to terminate as of the day of MTDB's possession.

MTDB filed its condemnation action to acquire the right-of-way across the course on November 3, 1994. On November 17, it obtained an order for possession of the course property, but did not take possession at that time.[10] After MTDB took possession of the course in July 1995, the course was reduced from 27 to 18 holes. In anticipation of MTDB's possession, Handlery and Chevron executed a July 6, 1995 amendment to the lease, prepared by Handlery, for the continued operation of the 18-hole course. The lease included a nonnegotiable waiver clause[11] that provided that Handlery shall

---

[8]At the design stage, there had been discussion of using the Handlery five-acre parcel as part of the reconfiguration. However, it was later determined it was needed for environmental mitigation and flood control.

[9]On November 18, 1996, the trial court entered judgment rejecting MTDB's right to take the parcel. On June 18, 1998, this court reversed, holding MTDB did have the right to take the property. (*San Diego Metropolitan Transit Development Board* v. *Handlery Holding Co.* (June 18, 1988) D027841, D028679 [nonpub. opn.].) A petition for review of that decision filed with the Supreme Court was denied June 18, 1988.

[10]Although named in the condemnation action, Handlery did not answer MTDB's complaint resulting in its default. After MTDB stipulated to set aside Handlery's default in October 1995, Handlery filed its answer to the complaint.

[11]Section 6 of the amendment to lease provided: "*Waiver of Leasehold Value.* Tenant hereby acknowledges and agrees that the provisions of Section 19.02 of the Lease entitled 'Awards' remain in full force and effect with respect to both the Old Premises and the New Premises and that Tenant confirms that any award for the taking of all or any part of the New Premises or Old Premises under the power of eminent domain shall be and remain the property of the Landlord, whether such award is made as compensation for diminution in the value of the leasehold or taking of the fee, or as compensation for any other interest in the Old Premises or the New Premises, and that Tenant shall have no right to participate in any such

not participate in any condemnation action or negotiate with MTDB.[12] This lease enabled Handlery to operate the course through September 1996, uninterrupted by MTDB, at which time Chevron decided to close down the course operations. The Handlery lease was terminated on September 20, by Chevron's letter dated September 13.[13]

Handlery then amended its answer to claim loss of business goodwill and precondemnation damages. In October 1996, MTDB unsuccessfully sought summary adjudication on the basis that Handlery had no compensable interests. The court then granted MTDB's request to bifurcate the trial and hear Handlery's claims first. On January 24, 1997, MTDB filed a series of stipulations. These agreements between MTDB and Chevron/PDR included a stipulation for judgment in which MTDB agreed to pay Chevron/PDR $9,719,000 for its property and interests necessary for the construction of the Mission Valley West Light Rail Transit Extension, with the exception of goodwill compensation. The stipulation further provided that the value of goodwill loss does not exceed $300,000. Also, Chevron/PDR waived "any statement of decision, further compensation, damages, costs, interest, notice of entry of judgment and appeal on all issues except loss of goodwill and their entitlement to goodwill." The parties additionally stipulated that "[i]f the goodwill claims of [Handlery] are dismissed before this case is sent to a jury for deliberation, the [PDR] interests will receive $300,000 for goodwill damages, without further proceedings." However, if the jury were to consider the issue of goodwill, then "it will be the trial position of [MTDB] that neither the PDR interests nor Handlery is entitled to goodwill damages." The matter went to trial in February 1997. On February 25, MTDB moved for nonsuit, which the court considered as a motion for judgment under section 631.8. The court granted the motion the following day, concluding MTDB's actions constituted neither unreasonable precondemnation conduct nor inverse taking; its actions did not cause Handlery to lose any goodwill; and Handlery's golf course business ended with the expiration of the long-term lease.

## STANDARD OF REVIEW

Handlery asserts this court must use its independent judgment to determine if condemnation law was correctly applied to the facts of this case,

---

condemnation proceedings or otherwise negotiate with or enter into any agreements with the Metro Transit Board with respect to any aspects of the Old Premises or New Premises."

[12]MTDB was not involved with negotiating this clause or any other portion of this lease.

[13]In August 1995, Chevron sent out a request for proposals for the operation of the new course to Handlery and others. Although Handlery responded to the request, it did not make Chevron's short list of new operators under consideration. Chevron eventually selected another operator to run the new course, as MTDB was not involved in that decision.

because the underlying historical facts are not in dispute. As we shall explain, we will exercise de novo review when confronted with questions of law and specifically the application of law to undisputed facts; however, where the facts are in dispute, we apply the deferential substantial evidence standard.

■ The standard of review of a judgment and its underlying findings entered pursuant to section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. In other words, the findings supporting such a judgment "are entitled to the same respect on appeal as are any other findings of a trial court, and are not erroneous if supported by substantial evidence." (*Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846, 853 [82 Cal.Rptr. 830]; *Roth* v. *Parker* (1997) 57 Cal.App.4th 542, 549-550 [67 Cal.Rptr.2d 250]; *Jordan* v. *City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1255 [54 Cal.Rptr.2d 340]; *Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 126 [89 Cal.Rptr. 601, 474 P.2d 417]; *U.S. Industries, Inc.* v. *Vadnais* (1969) 270 Cal.App.2d 520, 524 [76 Cal.Rptr. 44].) Consequently, where a trial court's factual finding is challenged on the ground there is no substantial evidence to sustain it, the power of the reviewing court begins and ends with the determination as to whether, on the whole record, there is substantial evidence, contradicted or uncontradicted, that will support the trial court's determination. (*Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925].)

· The appellate court views the evidence in the light most favorable to the respondents (*Charles C. Chapman Building Co.* v. *California Mart, supra*, 2 Cal.App.3d at p. 853), resolves all evidentiary conflicts in favor of the prevailing party and indulges all reasonable inferences possible to uphold the trial court's findings (*Jordan* v. *City of Santa Barbara, supra*, 46 Cal.App.4th at pp. 1254-1255). However, when the decisive facts are undisputed, the reviewing court is confronted with a question of law and is not bound by the findings of the trial court. (*Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) In other words, the appellate court is not bound by a trial court's interpretation of the law based on undisputed facts, but rather is free to draw its own conclusion of law. (*Torrey Pines Bank* v. *Hoffman* (1991) 231 Cal.App.3d 308, 317 [282 Cal.Rptr. 354].)

*No De Facto or Inverse Taking of Handlery's*
*Golf Course Business Occurred*

■ Handlery contends MTDB's unreasonable precondemnation conduct amounted to a de facto, or inverse, taking of its personal property—its

golf course business. It asserts MTDB's unreasonable conduct began no later than the summer of 1993, when it was confirmed it would not receive land dedicated as part of the development of the Levi/Cushman Specific Plan and that Chevron would probably want to extend the lease. Handlery argues that at that time, MTDB began to focus directly upon the impacts of acquiring the golf course—a focus that went beyond general planning for the trolley extension and dealt specifically with the impacts to the golf course business resulting from acquisition of the right-of-way. Those discussions evolved into negotiations relating to alternative "configurations" of course layouts, providing additional land to Chevron, and compensating Chevron for "lost profits" and "downtime." Handlery asserts MTDB then agreed to pay Chevron the cost of redesigning, reconstructing and expanding the course in order to replace those facilities owned and operated by Handlery, as it knew that providing Chevron with additional land and a "reconfiguration" away from Handlery would "allow the separation of the golf operation from the Handlery Hotel." Based upon MTDB's agreement to provide an "in kind" golf course to Chevron and its confirming actions, Chevron terminated its lease negotiations with Handlery, thus depriving it of virtually all right to continue its golf course business on a long-term basis.

█ The California Constitution, article I, section 19, provides that property may be taken or damaged for public use only where just compensation is paid to the owner. That constitutional provision authorizes both eminent domain proceedings instituted by a public entity to acquire private property, as well as inverse condemnation proceedings initiated by a landowner to obtain compensation for a claimed taking or damaging of his or her property. Both types of actions are governed by the same principles. (*Barthelemy* v. *Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558, 563-564 [76 Cal.Rptr.2d 575]; *Cambria Spring Co.* v. *City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1090 [217 Cal.Rptr. 772].)

In *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345], our Supreme Court recognized a right of compensation for inverse condemnation for a public entity's precondemnation conduct not amounting to an actual taking of property. The court had already established that particularly oppressive acts by a public entity, involving physical invasion or direct legal restraint on the use of property, could amount to a "de facto taking" of the affected property absent formal condemnation of it. (*Id.* at p. 46; *Barthelemy* v. *Orange County Flood Control Dist., supra,* 65 Cal.App.4th at p. 564.) █ In *Klopping,* the court concluded a condemner could be held liable for damages for the adverse economic impact to private property resulting from precondemnation delay and/or unreasonable

conduct. (*Klopping* v. *City of Whittier, supra*, 8 Cal.3d at pp. 51-52.) It held: "[W]hen the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property. . . ." (*Ibid.*) To demonstrate entitlement to damages for unreasonable precondemnation conduct, the court stated: "[A] condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping* v. *City of Whittier, supra*, 8 Cal.3d at p. 52, fn. omitted; *Barthelemy* v. *Orange County Flood Control Dist., supra*, 65 Cal.App.4th at p. 564; *Contra Costa Water Dist.* v. *Vaquero Farms, Inc.* (1997) 58 Cal.App.4th 883, 895-896 [68 Cal.Rptr.2d 272].)

Recovery under this theory requires some "direct" and "special" interference with the landowner's use of the property. " 'In order to state a cause of action for inverse condemnation, there must be an invasion or an appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specially affect the landowner to his injury. [Citation.]' " (*Barthelemy* v. *Orange County Flood Control Dist., supra*, 65 Cal.App.4th at p. 564, quoting *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111]; *Taper* v. *City of Long Beach* (1982) 129 Cal.App.3d 590, 615 [181 Cal.Rptr. 169].) "Absent a formal resolution of condemnation, the public entity's conduct must have 'significantly invaded or appropriated the use or enjoyment of' the property." (*Barthelemy* v. *Orange County Flood Control Dist., supra*, 65 Cal.App.4th at p. 565, quoting *Contra Costa Water Dist.* v. *Vaquero Farms, Inc., supra*, 58 Cal.App.4th at p. 899.) In other words, the affirmative conduct of the public entity must have significantly negatively affected the use or enjoyment of the property, lowering its value, physically burdening it, and/or decreasing the income it produced. (*Contra Costa Water Dist.* v. *Vaquero Farms, Inc., supra*, 58 Cal.App.4th at pp. 899, 901.) Moreover, a showing the public entity's conduct went beyond mere general planning might not be itself adequate to state a claim, as proof that obstacles were placed in plaintiff's path in the use of his or her land is necessary. (*Barthelemy* v. *Orange County Flood Control Dist., supra*, 65 Cal.App.4th at p. 565; *Jones* v. *City of Los Angeles* (1979) 88 Cal.App.3d 965, 972 [152 Cal.Rptr. 256].) Whether there has been unreasonable conduct by the condemner and what constitutes a direct and substantial impairment of property

rights for purposes of compensation constitute questions of fact. (*Contra Costa Water Dist.* v. *Vaquero Farms, Inc.*, *supra*, 58 Cal.App.4th at p. 897; *People* ex rel. *Dept. of Transportation* v. *Diversified Properties Co. III* (1993) 14 Cal.App.4th 429, 441 [17 Cal.Rptr.2d 676].)

 The gravamen of Handlery's de facto taking claim is that MTDB's precondemnation conduct deprived it of its opportunity to enter a hypothetical 10-to-15-year lease to continue operating its golf course business—a business that could not exist without an extension of the original lease. That conduct consisted of investigating and discussing with Chevron/PDR, the landowner, the impact of the trolley project upon the course, potential alignment routing plans, redesign and reconfiguration of the golf course and the implications and financial consequences of such action. That 1993 conduct produced an agreement between MTDB and Chevron/PDR for the former to pay the latter the cost of redesigning, reconstructing and expanding the course, rendering dispensable the clubhouse facilities owned and operated by Handlery. As a result of MTDB's commitment to the reconfiguration and replacement of the 27-hole golf course, Chevron in January 1994 terminated negotiations with Handlery, informing Handlery it intended to reconstruct the course away from Handlery's facilities. Handlery asserts the 1993 activities of MTDB in focusing specifically upon the continued use of the property as a golf course and agreeing to provide Chevron/PDR with additional property, financial aid and other assistance, took from Handlery its golf course business as surely as if MTDB had filed a direct condemnation action.

Regardless whether we apply de novo review or the deferential substantial evidence standard, one fatal flaw in Handlery's de facto taking claim is that it lost no compensable property right. A hypothetical future lease resting on the "probability of renewal," unlike a contractual option to renew an existing lease, is not a compensable property right (2 Nichols on Eminent Domain (rev. 3d ed. 1998) § 5.02[6][a], p. 5-107), because its potential execution rests upon the commercial vagaries of the market, its players and their competitive interests. Granted, "[t]here is some authority for the proposition advanced by appellant—that a tenant's reasonable expectation of renewal of a lease be considered as an element of value in condemnation proceedings. But the weight of authority, with which we are in accord, holds to the contrary. A tenant's right of renewal of a lease refers to a legal right, and this exists only when the lease expressly grants to the tenant the option to renew the lease at the end of its term. A mere expectation, or even probability, that the lease will be renewed based upon past practice and present good relations between landlord and tenant, is not a legal right of

renewal. It is nothing more than a speculation on chance. Intentions which are subject to change at the will of a landlord do not constitute an interest in land so as to confer upon the tenants something to be valued and compensated for in a condemnation action." (*Stroh* v. *Alaska State Housing Authority* (Alaska 1968) 459 P.2d 480, 482, fns. omitted; accord, *United States* v. *Petty Motor Co.* (1946) 327 U.S. 372, 380, fn. 9 [66 S.Ct. 596, 601, 90 L.Ed. 729]; *Scully* v. *United States* (10th Cir. 1969) 409 F.2d 1061, 1065; *Bagford* v. *Ephraim City* (Utah 1995) 904 P.2d 1095, 1099.) ■ Consequently, Handlery's hypothetical lease resting on a speculative expectation of renewal[14] is not compensable.[15]

Emphasizing it does not seek compensation for the loss of a real property interest but rather its personal property interest in its golf course business, Handlery essentially argues it is entitled to be compensated for the loss of its golf course business, including goodwill, as a result of MTDB's precondemnation conduct. Handlery asserts that it matters not that it may have had no compensable leasehold interest, because its personal property interest is separately compensable. (Citing *City of Vista* v. *Fielder* (1996) 13 Cal.4th 612, 620, fn. 6 [54 Cal.Rptr.2d 861, 919 P.2d 151].) Under the circumstances presented here, Handlery is mistaken.

■ We recognize the power of eminent domain extends beyond real property, to personal and even intangible property. (*City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 68 [183 Cal.Rptr. 673, 646 P.2d 835, 30 A.L.R.4th 1208].) However, to be a protectible property interest, the interest must be more substantial than a mere unilateral expectation of continued rights or benefits. (*Ruckelshaus* v. *Monsanto Co.* (1984) 467 U.S. 986, 1005 [104 S.Ct. 2862, 2874, 81 L.Ed.2d 815]; *Bagford* v. *Ephraim City*, *supra*, 904 P.2d at p. 1099.) Without a vested, legally enforceable property interest, there is no basis for compensation in an inverse condemnation proceeding for loss of future business. (*Ibid.*) ■ Here, Handlery's right or interest in operating the golf course was entirely dependent upon extending its lease for the property with Chevron/PDR. Without an option to

---

[14]Indeed, substantial evidence supports the trial court's conclusion Handlery's expectation of renewal was speculative at best. Handlery's interest in the property would have ended any way upon development of the property; the owners wished to regain control of the property; Handlery had made a "low ball" lease proposal that was not close to what the owners had expected; and Handlery faced an uphill battle with the Levi/Cushman families. Contrary to Handlery's assertion, the interim lease extensions pending MTDB taking possession and development evince nothing more than sound business judgment in mitigating damages by generating temporary income and not that the Levi/Cushman families did not want to avoid another long-term lease if possible with Handlery.

[15]Needless to say, "[t]here is no recovery via condemnation for the taking of a pipe dream." (*City of Los Angeles* v. *Lowensohn* (1976) 54 Cal.App.3d 625, 636 [127 Cal.Rptr. 417]; *Contra Costa Water Dist.* v. *Vaquero Farms, Inc.*, *supra*, 58 Cal.App.4th at p. 902.)

renew, Handlery had no legally protectible property interest in the continued operation of the course after the 50-year lease term expired naturally. Handlery's mere expectation is not one which is compensable in an inverse condemnation proceeding.

 We further acknowledge that where a condemner takes certain real property and the removal or relocation of either tangible or intangible personal property is impossible due to the condemnatory act, the owner is entitled to be justly compensated for the loss of property, regardless of its nature. (*Baldwin Park Redevelopment Agency* v. *Irving* (1984) 156 Cal.App.3d 428, 436-437, fn. 4 [202 Cal.Rptr. 792]; see also *Kimball Laundry Co.* v. *United States* (1949) 338 U.S. 1, 13-14, 16 [69 S.Ct. 1434, 1441-1442, 1443, 93 L.Ed. 1765, 7 A.L.R.2d 1280].) However, Handlery provides no authority for its specific proposition that unreasonable precondemnation conduct as to real property can result in a de facto taking of personal property, tangible or intangible, where the claiming party has no property interest in the real property taken.[16] Here, the real property interest is inextricably intertwined with the business of operating the golf course. Without the former, the latter does not exist. Consequently, where precondemnation conduct does not interrupt or affect a commercial lessee's enjoyment of its leasehold and that interest expires naturally, giving rise to no compensable real property interest, no derivative compensable personal property interest remains. This is so because once the leasehold is terminated, so is the business. Where the lease term expires naturally according to its terms, unaffected by condemnation or precondemnation conduct, there is no causal relationship between the later taking of the real property and the demise of the business. A fortiori, there has been no related loss.

 Moreover, MTDB did not engage in unreasonable precondemnation conduct. It legitimately and properly negotiated with the landowner of the

---

[16]Within the context of direct condemnation, the Eminent Domain Law (§ 1263.510) contemplates the taking of real property, or specifically here a leasehold interest, and a causal relationship between the taking and loss of goodwill before compensation for the latter. This right to recover loss of goodwill so limited has been judicially extended as to inverse condemnation. (*Post*, at p. 537.)

Moreover, it has been recognized within the context of an option to purchase real property that if the option holder can show he or she abandoned the option because of unreasonable precondemnation conduct by the condemnor, damages should not be precluded simply because the claimant no longer holds the option. (*Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 939 [162 Cal.Rptr. 210].) If the condemner's improper condemnation activities constitute a de facto taking during the period the option was valid, the date of the taking in the condemnation is not the date of filing, but rather the date of the improper conduct which amounted to the de facto taking. (*Ibid.*) Handlery essentially presents this identical theory with the fatal exception it as claimant does not possess a compensable real property interest.

subject property, given the 50-year lease held by Handlery was to terminate on June 30, 1994, without a contractual right or option to renew. Its negotiation with Chevron/PDR regarding the future use of the course after termination of the lease was no different than any other exploratory negotiations between Chevron and other interested parties. Its propriety is unaffected by its timing during the last year of the lease term or that MTDB is a public entity. Indeed, the record lacks any evidence MTDB interfered with Handlery's enjoyment of its long-term lease (see *Peter Kiewit Sons' Co.* v. *Richmond Redevelopment Agency* (1986) 178 Cal.App.3d 435, 443 [223 Cal.Rptr. 728]) or was even aware of Handlery's negotiations to extend the lease and sought to interfere with them. Rather, the record establishes that Handlery's long-term lease expired naturally without interference, its bid to extend the lease was rejected because it was too low, and its later 1995 proposal to operate the reconstructed course was also rejected as not responsive.[17]

Handlery cites *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 148-149, 152 [148 Cal.Rptr. 640, 583 P.2d 165], and *People* ex rel. *Dept. of Transportation* v. *Diversified Properties Co. III, supra,* 14 Cal.App.4th at pp. 442-443, noting the cooperative conduct in those cases between the state and local governmental entities resulted in de facto takings. It equates the conduct in those cases to MTDB's precondemnation conduct in providing the means and assurance of a publicly funded substitute golf course for the owners that effected a taking of its golf course business in January 1994, months before the adoption of any formal resolution of necessity. Handlery's reliance is misplaced. In *Diversified Properties Co. III,* the combined actions of the governmental entities deprived the landowner of

---

[17]The law is firmly established "that when and if a lessee before judgment enjoys his lease to the complete end of his term without being interfered with in any way by the condemning authority he is not entitled to share in the award made to the owner of the land, because he has suffered no loss." (*People* ex rel. *Dept. of Public Works* v. *Hartley* (1963) 214 Cal.App.2d 378, 381 [29 Cal.Rptr. 502]; see Cal. Law Revision Com. com., 19A West's Ann. Code Civ. Proc. (1982 ed.) § 1263.020, pp. 8-9; *Peter Kiewit Sons' Co.* v. *Richmond Redevelopment Agency, supra,* 178 Cal.App.3d at p. 443; *City of Industry* v. *Willey* (1970) 11 Cal.App.3d 658, 662-663 [89 Cal.Rptr. 922].)

Here, the record amply supports the trial court's conclusion Handlery's interest in the course terminated before entry of judgment. The original lease terminated naturally under its terms on June 30, 1994. MTDB filed its condemnation action in November 1994. A separate six-month lease anticipating development (the March 4, 1994, lease) was in place from July 1, 1994 through December 30, 1994. The parties executed a series of short-term leases that extended Handlery's operation of the course to July 10, 1995. At that time, MTDB took possession of a portion of the property, causing the parties to execute another short-term lease covering the remaining portion of the golf course (18 holes—the amendment to lease) from July 10, 1995, to September 30, 1995, continuing thereafter on a month-to-month basis with seven days written notice by the owners to terminate. Handlery enjoyed the complete benefits of each lease until the arrangement was terminated on September 20, 1996, at Chevron/PDR's sole election.

the right to develop his property, while the regulatory action of the governmental entities in *Jones* deprived a landowner of his right to access. Both cases involved a direct legal restraint placed upon property with the intent of reducing the value of the property before condemnation. Here, MTDB did not restrain Handlery. MTDB was not included in the lease negotiations between Handlery and Chevron. MTDB, like any other interested party, negotiated in good faith with Chevron regarding the future use of the golf course property consistent with its obtaining the necessary trolley right-of-way and mitigating damages.[18] Handlery simply did not convince Chevron/PDR that it was in their best interests to continue their business relationship with Handlery as operator of their golf course. MTDB had no control over that business decision of the owners. All it could do is what it in fact did do. It offered Chevron compensation for its taking in a reconfigured, in kind, golf course that would provide Chevron with not only a contemporary championship golf course, but also greater flexibility to insure a profitable operation. This latter flexibility was the direct result of Chevron's request that architect Robinson reconfigure the course away from Handlery facilities and Chevron's commitment to underwrite the cost of relocating the clubhouse, parking facilities and access. **(8)** Indeed, it is firmly established that when a public entity engages in competition with a private business and the latter suffers economic harm, the infliction of that harm does not constitute a "taking" of private property requiring compensation in a constitutional sense. (*Hladek* v. *City of Merced* (1977) 69 Cal.App.3d 585, 588 [138 Cal.Rptr. 194]; *Peerless Stages, Inc.* v. *Santa Cruz Met. Transit Dist.* (1977) 67 Cal.App.3d 343, 347 [136 Cal.Rptr. 567]; *United Railroads* v. *City and County of San Francisco* (1919) 249 U.S. 517, 521 [39 S.Ct. 361, 363, 63 L.Ed. 739].)[19, 20]

---

[18]Under these circumstances, contrary to Handlery's assertion, it matters not whether MTDB created the opportunity for Chevron/PDR to go forward with a reconfigured golf course not dependent upon Handlery facilities.

[19]We acknowledge a commercial tenant's right to compensation for its improvements on the property, as well as lost business goodwill, need not depend on the public agency's *actually* exercising its power of eminent domain, for its *substantial equivalent* will do. (*Langer* v. *Redevelopment Agency* (1999) 71 Cal.App.4th 998, 1003 [84 Cal.Rptr.2d 19]; *Lanning* v. *City of Monterey* (1986) 181 Cal.App.3d 352, 356 [226 Cal.Rptr. 258]; *Concrete Service Co.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1969) 274 Cal.App.2d 142, 147 [78 Cal.Rptr. 923].) "The key issue is whether under the particular circumstances the property in question was acquired as part of an open market transaction or whether its acquisition was in lieu of, or the substantial equivalent of, a condemnation proceeding." (*Langer* v. *Redevelopment Agency*, *supra*, 71 Cal.App.4th at p. 1003; *Pacific Outdoor Advertising Co.* v. *City of Burbank* (1978) 86 Cal.App.3d 5, 11-12 [149 Cal.Rptr. 906].)

At oral argument, Handlery essentially contended MTDB orchestrated the nonrenewal of its lease with Chevron through its precondemnation conduct, apparently analogizing it to the conduct of the public entities in *Lanning* and *Concrete Service Co.* that was held to be the

Our conclusion MTDB did not act unreasonably or capriciously under the circumstances presented here is consistent with judicial precedent that only invokes this doctrine sparingly to remedy the most egregious examples of official overreaching. We echo the opinion of the court in *Contra Costa Water Dist.* v. *Vaquero Farms, Inc.; supra*, 58 Cal.App.4th at page 899: "[S]uch judicial parsimony is warranted. While [the doctrine a direct and special interference with an owner's property can create precondemnation liability and entitlement to damages even without a formal resolution of condemnation] has become part of the fabric of California's eminent domain law, it undeniably broadens the concept of compensable injury under *Klopping* to encompass damages arising prior to any official announcement of condemnation. As such, its indiscriminate application risks either inhibiting legitimate preacquisition activities or promoting ill-advised precipitous condemnation action by officials concerned about exposure to additional claims of compensation." (Accord, *Barthelemy* v. *Orange County Flood Control Dist.*, *supra*, 65 Cal.App.4th at p. 570.)[21]

### Handlery Is Not Entitled to Recover Lost Goodwill

█ Although the constitutional provisions that mandate just compensation for the taking of private property for public use do not require compensation for the loss of business goodwill (*Redevelopment Agency* v. *International House of Pancakes, Inc.* (1992) 9 Cal.App.4th 1343, 1348 [12 Cal.Rptr.2d 358]; accord, *Community Redevelopment Agency* v. *Abrams* (1975) 15 Cal.3d 813, 831-832 [126 Cal.Rptr. 473, 543 P.2d 905, 81

substantial equivalent of condemnation. Casting aside there was no acquisition by MTDB of any property interest owned by Handlery here (see *Langer* v. *Redevelopment Agency, supra*, 71 Cal.App.4th at p. 1007), MTDB's precondemnation conduct is more akin to an "open market transaction" given the timing of the negotiations, the execution and implementation of any agreement only after the natural expiration of Handlery's 50-year lease, and the absence of any interference with any Handlery property interest. The suggestion that if MTDB he had not agreed to provide Chevron a reconfigured golf course and compensation, then Chevron could not have gone forward without Handlery is not the direct cause and effect contemplated by the eminent domain statutes. "A public agency is not liable in inverse condemnation unless the alleged damage arises *directly* from agency acquisition of the property in question or threat of acquisition. [Citations.] The Legislature clearly limited compensation under. . . sections 1263.205 and 1263.510 to instances where the public agency has 'taken' the property or an interest therein." (*Id.* at p. 1010.)

[20]At the poker table of competitive bidding, this is simply a case where Handlery misplayed its hand, standing "pat" in its belief that Chevron was dependent upon its facilities, that reconfiguration of the course was not a reasonably foreseeable option in the future and that Chevron/PDR was not inclined to make the capital investment necessary to relocate the clubhouse, parking facilities and access.

[21]Our determination MTDB did not engage in unreasonable precondemnation conduct renders it unnecessary to address Handlery's contention MTDB's conduct need only be a substantially concurring cause of damage to property to effectuate a taking.

A.L.R.3d 174]), section 1263.510 provides a statutory right for landowners (or lessees of condemned property) to recover lost goodwill under certain circumstances. (*Redevelopment Agency* v. *Thrifty Oil Co.* (1992) 4 Cal.App.4th 469, 474 [5 Cal.Rptr.2d 687].) As to entitlement of goodwill, the landowner bears the burden of proof. (*Id.* at p. 475; *People* ex rel. *Dept. of Transportation* v. *Leslie* (1997) 55 Cal.App.4th 918, 922 [64 Cal.Rptr.2d 252].) To recover lost goodwill under that provision, the claimant must prove, among other things, that it is the business owner, the loss was caused by the taking of the property or injury to the remainder, and the loss cannot reasonably be avoided by relocation of the business or by taking other measures and adopting procedures that a reasonably prudent person would take and adopt in preserving goodwill. (§ 1263.510, subd. (a)(1), (2).) Subdivision (b) of section 1263.510 defines "goodwill" as meaning "the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." The underlying purpose of this statute is to provide compensation for the kind of losses which typically occur when an ongoing business is forced to move and give up the benefits of its former location. It includes not only compensation for lost patronage itself, but also for expenses reasonably incurred in an effort to prevent a loss of patronage. (*People* ex rel. *Dept. of Transportation* v. *Muller* (1984) 36 Cal.3d 263, 270-272 [203 Cal.Rptr. 772, 681 P.2d 1340]; *Barthelemy* v. *Orange County Flood Control Dist.*, *supra*, 65 Cal.App.4th at pp. 566-567.) The provision contemplates the taking of a real property interest which in turn causes the loss of goodwill in order for there to be compensation for the latter. (§ 1263.510, subd. (a).)

■ Although the statutory scheme applies only to eminent domain proceedings, the right to recover lost goodwill has been extended to the indirect condemnee. (*Chhour* v. *Community Redevelopment Agency* (1996) 46 Cal.App.4th 273, 279 [53 Cal.Rptr.2d 585].) Thus, "goodwill is compensable in an inverse condemnation action to the same extent and with the same limitations on recovery found in . . . section 1263.510." (*Id.* at p. 282.)

■ The trial court correctly ruled Handlery had not met its burden of proof that it was entitled to compensation for loss of goodwill. Only an owner of a business conducted on the real property taken may claim compensation for loss of goodwill. (*Redevelopment Agency* v. *International House of Pancakes, Inc.*, *supra*, 9 Cal.App.4th at p. 1352.) When Handlery's long-term lease for the course expired, its business of operating the golf course on a long-term basis ceased and essentially reverted to Chevron/PDR. The original lease provided that all improvements constructed on the property reverted to the fee owners after the lease expired. None of the tees,

fairways or greens for the golf course were located on Handlery's property. Handlery's clubhouse facilities were on its own property and not part of the 200-acre parcel. In order to mitigate damages and generate revenue pending development, Chevron permitted Handlery to continue to operate the business on an interim basis during the period before MTDB's possession. The parties executed a series of short-term extensions anticipating expiration upon development. Contrary to Handlery's assertion, these interim lease extensions did not transmute its status to that of a business owner affected by the taking with a compensable interest for condemnation purposes. Rather, the brief terms of these successive lease extensions, culminating with a month-to-month tenancy terminable on seven days notice, define the length of time Handlery reasonably expected to remain in the business of operating the golf course. (*State, DOTD* v. *Morein* (La.Ct.App. 1993) 628 So.2d 1191, 1193.)[22]

Similarly, Handlery can establish neither the taking of a real property interest that it held nor a causal nexus between its alleged loss of goodwill and the taking of property, given its right to operate the business on a long-term basis ceased upon the natural expiration of the original lease. Indeed, "[t]he making of a lease subsequent to, and while the institution of condemnation proceedings are still pending, is insufficient to vest any compensable rights in the lessee." (2 Nichols, on Eminent Domain *supra*, § 5.02[6][a], p. 5-104.)[23] The lease extensions simply permitted Handlery to operate the course on a temporary basis while providing Chevron/PDR revenue pending development and MTDB's taking possession of the property. They did not confer upon Handlery a leasehold interest subject to condemnation and compensation, giving rise to a derivative but separate compensable interest for its business.

---

[22]This is not the case where the impending expropriation constituted the sole reason for shortening what would otherwise have been a longer lease term in a well-established and mutually satisfactory lessor-lessee relationship, giving rise to recovery of business losses beyond the expiration of the original lease term. (*Packard's Western Store* v. *State, D.O.T.* (La.Ct.App. 1993) 618 So.2d 1166, 1173-1174.)

[23]Handlery's reliance on the March 4, 1994, six-month lease, effective July 1, 1994, and on the date of the filing of the condemnation action to acquire the right-of-way across the course on November 3, 1994, is misplaced. That lease was the first of several short-term extensions entered into by the parties after Handlery had learned Chevron/PDR was not going to enter a new long-term lease with it, but rather would pursue other options including reconfiguring the course away from its facilities. It was entered into in contemplation of the condemnation proceedings. It was designed to mitigate damages by generating revenue during the interim period between expiration of the long-term lease and MTDB taking possession. Consequently, it does not vest any compensable rights in Handlery.

### DISPOSITION[24]

The judgment is affirmed.

Kremer, P. J., and McDonald, J., concurred.

---

[24]In light of our disposition, it is unnecessary to address MTDB's contentions Handlery waived its right to participate in these condemnation proceedings and to claim loss of goodwill under section 6 of the March 1994 lease and the amendment to the lease.