[No. D043044. Fourth Dist., Div. One. Apr. 11, 2005.]

REDEVELOPMENT AGENCY OF THE CITY OF SAN DIEGO, Plaintiff and Respondent, v.
BAHIRA ATTISHA et al., Defendants and Appellants.

COUNSEL

Niddrie & Fish and David A. Niddrie for Defendants and Appellants.

Casey Gwinn, City Attorney, Anita M. Noone, Assistant City Attorney, Leslie A. Fitzgerald, Deputy City Attorney; Law Offices of Don Detisch and Donald W. Detisch for Plaintiff and Respondent.

OPINION

**McCONNELL, P. J.**—In this eminent domain case, defendants Bahira and Behnam Attisha and Kheder and Balsam Attisha appeal a judgment awarding them $400,000 for loss of business goodwill. The Attishas contend the trial court erred by (1) disallowing compensation for business inventory; (2) striking the testimony of their expert goodwill valuation witness on the grounds that (a) under this court's opinion in *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517 [86 Cal.Rptr.2d 473] (*Handlery*), as a matter of law the expectation of a lease renewal is speculative and cannot provide a foundation for a goodwill award, and (b) the expert impermissibly considered business sales outside the San Diego area in his "cash flow multiplier" valuation method; (3) excluding the testimony of Bahira Attisha on goodwill valuation; and (4) directing a verdict in the amount to which the goodwill valuation expert of the Redevelopment Agency of the City of San Diego (Agency) testified.

We conclude the court misinterpreted *Handlery*, abused its discretion by striking the expert's testimony and erred by directing a verdict. The goodwill valuation issue should have gone to the jury. We reverse the judgment insofar as it concerns the goodwill issue and remand for a new trial limited to that issue. In all other respects we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1993 the Attishas purchased Valu-Mart, a grocery and liquor store located at the corner of 12th Avenue and Market Street in downtown San Diego. Hikmat Mansour and George Deddeh and their wives owned the building in which Valu-Mart was situated (real property owners). In June 1998 the Attishas entered into a five-year lease at below market rent, with an option to renew the lease for another five years at a favorable rent.

Also in 1998, the Agency designated Valu-Mart's neighborhood as "blighted." The City of San Diego adopted the "East Village Implementation Plan" to give the private sector development opportunities in the area. In

November 2001 the Agency filed a complaint in eminent domain against the real property owners and the Attishas to take the property for public use, and as a result Valu-Mart closed in March 2002.

Under a stipulated judgment, the Agency paid the real property owners for their interests in the property. Those parties agreed the highest and best use of the property is redevelopment.

Before trial of the Valu-Mart portion of the condemnation, the Attishas and the Agency agreed on the amount of compensation for the business's improvements, equipment and fixtures. Further, the parties stipulated in writing that the Agency had a right to take Valu-Mart in eminent domain and there was no suitable relocation site for the business, and disputed issues for trial included the "amount of business goodwill [the Attishas] [are] entitled to (if any)," and whether they are "entitled to compensation for business inventory."

At trial, the parties agreed the Attishas' *entitlement* to goodwill was not disputed and the only issue regarding goodwill was its *value*. The date of valuation is November 27, 2001, when approximately seven years remained on the Attishas' lease, assuming exercise of the renewal option. The Attishas' expert valuation witness, Nevin Sanli, testified the Valu-Mart site had been a market for more than 50 years, and "[b]eing recognized as a market in that area for a very long time is an aspect of valuing the business." Further, Valu-Mart had only limited competition in the area, and Sanli characterized it as "a well-run operation in a very good location," although "not La Jolla." Between 1997 and 2001 Valu-Mart's sales and profits steadily increased, and it had no long-term debt and paid its vendors in a timely manner.

Using alternative methods of "cash flow multiplier" and "capitalized excess earnings," Sanli calculated goodwill values of $870,000 and $1,008,700, respectively. He gave equal weight to the methods and averaged the figures to arrive at a value of $940,000.

Under Sanli's "cash flow multiplier" approach, adjusted annual profit is multiplied by the number of years within which a purchaser would expect to recoup the purchase price (the multiplier). Sanli chose a multiplier of five years, based on the multipliers of several comparable sales after 1997 for small businesses he researched on computer databases. The comparable sales were located in California cities other than San Diego.[1]

---

[1] "The capitalization of excess earnings approach values goodwill as follows. First, the net earnings of the business are computed by subtracting expenses and reasonable officers' salaries from gross earnings. Next, a percentage return which would 'normally' be expected from the value of the tangible assets of the business is calculated and then subtracted from the net

On cross-examination, Sanli conceded his valuations were based on the assumption Valu-Mart would continue to operate at the premises beyond the seven years remaining on the lease and "for the foreseeable future." Sanli testified he had not seen "anything published that indicate[d] . . . there was an interest in developing this property," and thus he "assumed . . . there was no reason . . . [Valu-Mart] would no longer operate."

After Sanli's testimony concluded, the Agency filed a written motion to strike the testimony on the ground the assumption lacked foundation. The Agency argued that under this court's opinion in *Handlery, supra,* 73 Cal.App.4th 517, as a matter of law the expectation of a lease renewal is speculative and cannot provide a foundation for a goodwill award. The Agency also argued Sanli's testimony lacked foundation because the comparable sales he considered in selecting five years as a multiplier in his "cash flow multiplier" approach impermissibly included tangible assets. Further, the Agency complained the Attishas did not comply with discovery statutes requiring the exchange of Sanli's valuation data, in that he changed his valuations shortly before trial. The court took the matter under submission and gave the Attishas the opportunity to respond.

The Agency next presented its real estate appraiser, Ted Hendrickson, who testified the real property's fair market value was based on a highest and best use of mixed residential and commercial redevelopment. He explained the property was in the "East Village district of the Center City community planning area," and the "market trends in the area were for older buildings that were nearing the end of their economic lives to be cleared and redeveloped with new uses." He testified that some buildings in the area had been sold with existing leases, and if a property is subject to an existing lease, "either the seller of the property negotiates a purchase of the lease or in some cases the buyer or a combination of the two, but because of the development pressure upon certain parcels within areas like the East Village, there are purchases of those leases in one way or another."

Additionally, the Agency's real estate economist, Alan Nevin, testified "the best product" for the property in question "would be a four-story condominium project with mostly two bedroom, two bath units of about 1,000

---

earnings. The remaining figure, if any, is the 'excess' earnings of the business and is attributable to intangible assets, usually goodwill. The capitalized present value of the excess earnings is computed by dividing the excess earnings figure by a percentage which reflects current interest rates." (*People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 266, fn. 2 [203 Cal.Rptr. 772, 681 P.2d 1340].)

The Attishas assert Sanli used a third separate valuation method, "comparable sales." Sanli, however, used comparable sales as an element of his "cash flow multiplier" approach.

square feet." According to Nevin, the "entire development activity in downtown was moving towards East Village . . . because the rest of the area downtown was pretty well built out."

After this testimony, the court considered the Agency's motion to strike Sanli's testimony. The court interpreted *Handlery* to mean that even if the real property owners were to testify they " 'had no intentions of not granting [the Attishas] a new lease at the end of its term, . . .' that would be inadmissible testimony." In addition, the court criticized Sanli's use of comparable sales from areas outside of San Diego in arriving at his multiplier of five for the "cash flow multiplier" valuation method. The court rejected the Attishas' argument these issues go to the weight of Sanli's testimony rather than its admissibility, and granted the Agency's motion to strike his testimony.

The Agency then called its expert goodwill valuation witness, Glenn Desmond. Using alternative approaches of "revenue multiplier," "owner's discretionary cash flow" and "excess earnings," Desmond valued the Attishas' goodwill loss at, respectively, $422,000, $407,000 and $384,000. In his view, $400,000 was the appropriate goodwill valuation, taking into consideration the alternative approaches and "some supplemental information" such as deferred maintenance.

In the "excess earnings method" he used a value multiplier of three years. To arrive at the multiplier, Desmond relied on several comparable sales in the San Diego area. Desmond testified that even ignoring the eminent domain action, there was a "very high risk" Valu-Mart would not have remained in business more than three years longer because rents in the area were increasing rapidly and the private sector was undertaking redevelopment.

The Agency then successfully moved for a directed verdict for $400,000 on the ground Desmond's was the only valuation testimony. The court allowed the Attishas' request to make an offer of proof regarding Bahira Attisha's goodwill valuation as an owner. She believed the value of goodwill was $1.3 million, based on a "multiplier" of net profit of between five and 10. She arrived at her multiplier theory by talking "to everybody," including unnamed brokers and certain store owners. The court disallowed the testimony for lack of foundation. The court recalled the jury and advised them the case was resolved. It entered a $400,000 judgment for the Attishas on July 10, 2003.

## DISCUSSION

### I

### *General Principles of Eminent Domain Law*

██ " 'An owner is entitled to just compensation for property taken for public use. [Citations.]' The principle behind the concept of just compensation is to put the owner in as good a position pecuniarily as he would have occupied if his property had not been taken. [Citations.] But it is the duty of the state to see that compensation is just not merely to the individual whose property is taken, but to the public that is to pay for it. [Citation.] 'The just compensation required by the constitution to be made to the [property] owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public.' " (*City of Carlsbad v. Rudvalis* (2003) 109 Cal.App.4th 667, 678 [135 Cal.Rptr.2d 194].)

██ A "condemnation award is based on the property's *fair market value*. [Citation.] Generally, fair market value is measured by the property's '*highest and best use*' for which it is 'geographically and economically adaptable.' [Citations.] [¶] That determination may reflect a 'special use' to which the property is presently being put[,] but it cannot be measured by the condemning entity's *projected* or *hypothetical* 'special purpose' unless the entity's proposed use is also the 'highest and best use' in the hands of a private property owner. [Citations.] [¶] In other words, the 'market' for determining 'fair market value' is ordinarily the *private marketplace*—i.e., 'what willing, knowledgeable non-governmental buyers and sellers would pay for property to be used for a non-governmental purpose.' " (Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2004) ¶ 7:313.1, p. 7-68.)

██ "Where all the property subject to a lease is acquired for public use, the lease terminates." (Code. Civ. Proc.,[2] § 1265.110.) When condemnation terminates a tenancy, the lessee is ordinarily entitled to share in the condemnation award to compensate for the value of his or her leasehold interest. (§ 1265.150; *City of Vista v. Fielder* (1996) 13 Cal.4th 612, 616 [54 Cal.Rptr.2d 861, 919 P.2d 151].) As here, however, a lessee may waive such a right or assign it to the lessor.[3] (*City of Vista v. Fielder*, at pp. 617–618.) "A

---

[2] Undesignated statutory references are to the Code of Civil Procedure.

[3] The Attishas' lease provided that in the event of an eminent domain proceeding, "[t]he total and entire award or compensation . . . , whether for a total or partial taking, or for diminution in the value of the leasehold . . . shall belong to, and be the property of Landlord:

tenant and landlord may apportion a condemnation award any way they see fit." (*Chhour v. Community Redevelopment Agency* (1996) 46 Cal.App.4th 273, 283 [53 Cal.Rptr.2d 585].)

■ A lessee may also be entitled to compensation for other property taken, such as fixtures and equipment, and goodwill. (*City of Vista v. Fielder, supra*, 13 Cal.4th at p. 616; §§ 1263.210, 1263.310, 1263.510, subd. (a).) "Goodwill" is defined as "the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage." (§ 1263.510, subd. (b).) "Goodwill value is a transferable property right which is generally defined as the amount a willing buyer would pay for a going concern above the book value of the assets." (*Roth v. Roth* (Minn.Ct.App. 1987) 406 N.W.2d 77, 80.)[4]

■ The business owner has the initial burden of showing entitlement to compensation for lost goodwill. This entails proof the condemnation caused the loss, the loss cannot reasonably be prevented by relocating the business or otherwise mitigating damages, and compensation for the loss will not be included in relocation benefits allowed under Government Code section 7262 or otherwise duplicated in the condemnation award. (Code Civ. Proc. § 1263.510, subd. (a).)

■ "Once these foundational conditions are proven, the trier of fact must determine the amount of compensation . . . for . . . loss of goodwill, based on whatever evidence is before it." (*People ex rel. Dept. of Transportation v. Salami* (1991) 2 Cal.App.4th 37, 45 [2 Cal.Rptr.2d 833].) " ' "The right to a jury trial . . . goes *only* to the *amount* of compensation." ' [Citations.] 'All other questions of fact, or mixed fact and law, are to be tried . . . without

---

provided, that Tenant shall be entitled to recover from the condemnor such compensation as may be separately awarded by the condemnor to Tenant . . . in its own right for the taking of trade fixtures and equipment owned by Tenant in its own right . . . and for the expense of removing and relocating them, and for the loss of goodwill to the extent that it is severally awardable."

[4] Compensation for goodwill is not constitutionally required, and historically it was not an element of damages under California's eminent domain law. (*City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379, 387 [76 Cal.Rptr.2d 9].) In 1975, however, the Legislature enacted a comprehensive revision of eminent domain law " ' in response to a widespread criticism of the injustice wrought by the Legislature's historic refusal to compensate condemnees whose ongoing businesses were diminished in value by a forced relocation. [Citations.] The purpose of the statute was unquestionably to provide monetary compensation for the kind of losses which typically occur when an ongoing small business is forced to move and give up the benefits of its former location.' " (*Id.* at p. 388, quoting *People ex rel. Dept. of Transportation v. Muller, supra*, 36 Cal.3d at p. 270.)

reference to a jury.' " (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1116 [125 Cal.Rptr.2d 12] (*Emeryville*).) In determining the amount of compensation, neither party bears the burden of proof. (§ 1260.210, subd. (b).)

■ In enacting section 1263.510 the Legislature did not specify any particular method for valuing loss of goodwill, and courts have held " 'there is no single acceptable method of valuing goodwill. [Citation.] Valuation methods will differ with the nature of the business . . . and with the purpose for which the evaluation is conducted.' " (*City of San Diego v. Sobke, supra,* 65 Cal.App.4th at p. 389.) " '[E]ach case must be determined on its own facts and circumstances and the evidence must be such as legitimately establishes value.' " (*Ibid.*)

## II

### *Agreement Between Agency and Real Property Owners Regarding Highest and Best Use*

■ Preliminarily, we note the agreement between the Agency and the real property owners regarding the highest and best use of the real property—redevelopment—does not bind the Attishas. (*People ex rel. Dept. of Pub. Wks. v. Amsden Corp.* (1973) 33 Cal.App.3d 83, 88 [109 Cal.Rptr. 1].) Stated in collateral estoppel terms, a prior stipulated judgment has collateral estoppel effect only when the doctrine is asserted against a party to the stipulation or one who was in privity with such a party. (*Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346, 1364 [104 Cal.Rptr.2d 183].)

The Agency contends *Emeryville, supra,* 101 Cal.App.4th 1083, precludes the Attishas from presenting evidence of a highest and best use different from that agreed on by the Agency and the real property owners.[5] The Agency asserts that since the property owners obtained an enhanced value of the real property based on projected redevelopment, the Attishas' goodwill claim is limited because it is established that Valu-Mart could not have remained in business much longer.

■ In *Emeryville,* the property owner and the redevelopment agency agreed the highest and best use of the condemned property was a new shopping center, and the fair market value of the property was predicated on that use. Under that circumstance, the court held the *owner* was not entitled to compensation for fixtures and equipment on the property at the time of

---

[5] We requested supplemental briefing from the parties on the highest and best use issue, and we have taken their responses into consideration.

condemnation, because "we have little doubt that California law incorporates the principle of 'consistent use,' i.e., 'that land cannot be valued based on one use while improvements are valued based on another.' . . . Thus a landowner cannot recover compensation based on a use more valuable than the existing one while simultaneously claiming recovery under section 1263.210(a) for existing improvements that are incompatible with that use." (*Emeryville, supra*, 101 Cal.App.4th at pp. 1110–1111.) The court also held development of a shopping center was incompatible with the owner's claim for loss of goodwill, explaining the "allowance of the goodwill claim . . . would on its face have effected a windfall incompatible with [the owner's] theory of value." (*Id.* at p. 1120.)

In contrast to *Emeryville*, the Attishas' rights were not adjudicated in the stipulated judgment between the Agency and the real property owners. While the Attishas' counsel signed the stipulation, it specifically excluded any claims of the Attishas, with the exception that they waived any claims related to the real property. Accordingly, they are not claiming inconsistent uses and may disagree with the Agency's and real property owners' position. Moreover, "[i]n the absence of proof to the contrary, the highest and best use of property is presumed to be its current use." (*United States v. 69.1 Acres of Land* (4th Cir. 1991) 942 F.2d 290, 292; see *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 867 [135 Cal.Rptr. 647, 558 P.2d 545] [burden is on condemnee to show highest and best use different from current use]; *Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 85 [185 Cal.Rptr. 159] [same].) Thus, in assessing Valu-Mart's goodwill loss Sanli did not err by presuming the current use would continue. In turn, the Agency may rely on the agreement between it and the real property owners to support its argument, and testimony of its experts, that the property was ripe for redevelopment, thereby limiting Valu-Mart's future even absent the condemnation. (*People ex rel. Dept. of Pub. Wks. v. Amsden Corp., supra*, 33 Cal.App.3d at p. 88). It is the jury's province to resolve the conflict in expert opinion. (*Ibid.*; *People ex rel. Dept. Pub. Wks. v. Silveira* (1965) 236 Cal.App.2d 604, 620 [46 Cal.Rptr. 260]; *People v. Loop* (1954) 127 Cal.App.2d 786, 801–802 [274 P.2d 885].) Indeed, the Agency did not argue at trial that the Attishas are bound by the agreement between it and the real property owners.[6]

---

[6] We reject the Agency's contention that since the established highest and best use of the Valu-Mart property is redevelopment, the Attishas cannot meet their threshold burden of showing goodwill losses are attributable to the condemnation. As discussed, highest and best use is not established as to the Attishas. Moreover, the Agency stipulated that the condemnation caused them loss of goodwill, and thus they were not required to establish entitlement to goodwill losses.

III

*Exclusion of Sanli's Expert Goodwill Valuation Testimony*

A

In striking Sanli's testimony, the trial court relied principally on *Handlery, supra*, 73 Cal.App.4th 517. In the trial court's view, *Handlery* stands for the proposition that in valuing goodwill, evidence of a tenant's expectation of a lease renewal is inadmissible as a matter of law.

The Attishas contend *Handlery* is inapplicable because the facts there "are totally and critically different than the facts here." They assert Sanli reasonably assumed the lease would be extended beyond the seven years remaining in the lease based on evidence the Valu-Mart site had been a market for decades, Valu-Mart operated there for several years, there was a family relationship between the Attishas and the real property owners, Valu-Mart paid below market rent, and the amount Attishas paid for Valu-Mart indicated an intent that it remain in business a long period.

In *Handlery*, this court held the Handlery Hotel, Inc. (Handlery) was not entitled to precondemnation damages or loss of goodwill associated with the condemnation of property on which it had operated a golf course for more than 40 years under a long-term lease. The lease expired in June 1994. In January 1994 a co-owner of the property, Chevron Corporation (Chevron), informed Handlery it was not interested in extending the lease and was pursuing other options. At the same time, Chevron began discussions with San Diego Metropolitan Transit Development Board (MTDB) regarding the Mission Valley West Light Rail Transit Extension, which would bisect the course and extend the trolley from Old Town to the east of what is now Qualcomm Stadium. By May 1994 Chevron had decided to reconstruct the clubhouse away from Handlery's facilities.

In early 1994, after Chevron informed Handlery it would not enter into a new long-term lease, the parties negotiated a six-month lease to generate revenue from the course pending MTDB's project. The new temporary lease, effective July 1, 1994, was constructed in light of MTDB's project, contained a condemnation clause and did not contain an automatic right of renewal. The parties subsequently negotiated several short-term extensions to the lease, which were set to terminate as of the day of MTDB's possession.

In November 1994 MTDB filed an eminent domain action to acquire a right-of-way across the golf course; it included Handlery as a defendant. MTDB obtained an order of possession for the course property that month,

but it did not actually take possession until July 1995. In anticipation of MTDB's possession, Handlery and Chevron executed a July 6, 1995 amendment to the lease for the continued operation of the golf course. The lease included a waiver clause that precluded Handlery from participating in any condemnation action or negotiating with MTDB. Under this lease, Handlery operated the course through September 1996, uninterrupted by MTDB, at which time Chevron closed the course.

Handlery raised a de facto taking claim, alleging MTDB's precondemnation conduct deprived it of the opportunity to enter a hypothetical 10-to 15-year lease to continue operating the golf course. We rejected the claim, explaining: "[O]ne fatal flaw in Handlery's de facto taking claim is that it lost no compensable property right. A hypothetical future lease resting on the 'probability of renewal,' unlike a contractual option to renew an existing lease, is not a compensable property right [citation], because its potential execution rests upon the commercial vagaries of the market, its players and their competitive interests. Granted, '[t]here is some authority for the proposition . . . that a tenant's reasonable expectation of renewal of a lease be considered as an element of value in condemnation proceedings. But the weight of authority, with which we are in accord, holds to the contrary. A tenant's right of renewal of a lease refers to a legal right, and this exists only when the lease expressly grants to the tenant the option to renew the lease at the end of its term. A mere expectation, or even probability, that the lease will be renewed based upon past practice and present good relations between landlord and tenant, is not a legal right of renewal. It is nothing more than a speculation on chance. Intentions [that] are subject to change at the will of a landlord do not constitute an interest in land so as to confer upon the tenants something to be valued and compensated for in a condemnation action.' [Citations.] Consequently, Handlery's hypothetical lease resting on a speculative expectation of renewal is not compensable." (*Handlery, supra,* 73 Cal.App.4th at pp. 531–532, fn. omitted.)

Further, as to goodwill we held that "where the lease term expires naturally according to its terms, unaffected by condemnation or precondemnation conduct, there is no causal relationship between the later taking of the real property and the demise of the business. A fortiori, there has been no related loss." (*Handlery, supra,* 73 Cal.App.4th at p. 533.) We concluded that under the circumstances, Handlery had not met its burden of showing entitlement to compensation for loss of goodwill. "Only an owner of a business conducted on the real property taken may claim compensation for loss of goodwill. [Citation.] When Handlery's long-term lease for the course expired, its business of operating the golf course on a long-term basis ceased and essentially reverted to" the owners. (*Id.* at p. 537.) "Contrary to Handlery's assertion, [the] interim lease extensions did not transmute its status to that of a business owner affected by the taking with a compensable interest for

condemnation purposes. Rather, the brief terms of these successive lease extensions, culminating with a month-to-month tenancy terminable on seven days notice, define the length of time Handlery reasonably expected to remain in the business of operating the golf course." (*Id.* at p. 538.)

■ *Handlery* contains broad language lending support to the Agency's position, but the facts here are significantly different. "A decision is authority only for the point actually passed on by the court and directly involved in the case. General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985, 44 Cal.Rptr.2d 93; see *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].)

When the Agency filed its condemnation action the Attishas were operating Valu-Mart under a valid lease, and on the date of valuation seven years remained on the lease. In contrast to *Handlery*, the Attishas did have a property interest. Further, here the parties stipulated to the Attishas' entitlement to compensation for loss of goodwill, and the remaining issue for trial was valuation. *Handlery* does not suggest that when condemnation caused termination of a lease and the tenant's entitlement to goodwill is established, evidence of his or her reasonable expectation of a lease renewal is inadmissible as a matter of law in valuing goodwill loss.

Indeed, in *Handlery* we noted that while Handlery's successive short-term lease extensions defined the length of time it reasonably expected to remain in business, "[t]his is not the case where the impending expropriation constituted the sole reason for shortening what would otherwise have been a longer lease term in a well-established and mutually satisfactory lessor-lessee relationship, giving rise to recovery of business losses *beyond the expiration of the original lease term.*" (*Handlery, supra,* 73 Cal.App.4th at p. 538, fn. 22, italics added.) We cited *Packard's Western Store v. State, D.O.T.* (La.Ct.App. 1993) 618 So.2d 1166, 1173–1174 (*Packard's*), in which a shopping center tenant (Packard's) sued the state for loss of goodwill after it took the center for a right-of-way. Packard's and the landlord entered into a lease in 1975 and extended it several times, usually for a term of three to four years, and beginning September 1986 they extended the lease every six months because of the impending expropriation. The last extension began in March 1986 and would have run through August but for the taking in April 1986. (*Id.* at pp. 1169–1170.)

A jury awarded Packard's lost profits, and the state appealed, arguing no award should have been made for lost profits after August 1986, when Packard's last lease would have expired. The state argued "the trial court

erred in instructing the jury that losses beyond the lease term could be awarded if Packard's 'has proved by a preponderance of the evidence that it had an option or guarantee that [its] lease would have been renewed.' " (*Packard's, supra*, 618 So.2d at p. 1173.) Packard's argued "that a tenant should be allowed to recover business losses beyond the expiration of the lease term if the evidence shows more probably than not that the lease would have been extended for a longer term but for the expropriation." (*Ibid.*)

The appellate court found no error in the jury instruction, explaining: "While it is true that a business lessee's right to possess the property depends on the existence of a lease, where the landowner's does not, we decline to say that a lessee may never recover business losses beyond the expiration of the lease term, particularly when, as here, the impending expropriation is found to be the sole reason for shortening what would otherwise have been a longer lease term in a well-established and mutually satisfactory lessor-lessee relationship." (*Packard's, supra*, 618 So.2d at p. 1173.) The evidence there showed a history of lease renewals and the landlord's offer, before learning of the imminent expropriation, to extend the lease to July 1988. Further, the shopping center's leasing agent testified Packard's was "a very, very good tenant" that always paid rent on time and achieved high enough gross sales to trigger rent override payments, it "was an extreme asset to the property" and "brought in a lot of people into the area, which . . . helped all of the tenants that were located in the property," and its lease would have been extended for a term of three to five years but for the state's taking. (*Id.* at p. 1174.)

" ' " 'In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value.' " ' [Citation.] Where . . . 'an expert in a condemnation action employs a methodology not sanctioned by California law, his opinion may be excluded.' " (*City of San Diego v. Sobke, supra*, 65 Cal.App.4th at p. 396; see also Evid. Code, § 801 [expert testimony must be based on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion"].)

We conclude the trial court abused its discretion by striking Sanli's testimony, based on a misinterpretation of *Handlery*. We agree with the approach in *Packard's*—although the evidence Sanli relied on regarding the likelihood of a continued lease was considerably weaker than the evidence in *Packard's,* it was sufficient for jury consideration. It was the jury's province to determine whether there was a reasonable probability of a lease renewal given the Agency's conflicting evidence the highest and best use of the property is redevelopment in the near future.

## B

■ Further, the court improperly excluded Sanli's testimony on the ground he used comparable sales outside the San Diego area in his "cash flow multiplier" valuation method. To be admissible, a sale must only "shed[] light on the value of the [property] being valued.' " (*People ex rel. Dept. Pub. Wks. v. Reardon* (1971) 4 Cal.3d 507, 512 [93 Cal.Rptr. 852, 483 P.2d 20]; Evid. Code, § 816.) Sanli testified he did not use San Diego area sales because none were reported on the databases he used. The Agency's own expert, Desmond, testified those databases are reliable "for business valuation appraisers to understand goodwill comparables," and business sales—when used to select a "multiplier" to value goodwill—vary little with geographical area. Desmond agreed such sales "are the same whether they are in Portland, Maine, in 1992, versus Los Angeles or San Diego in 2000." The Agency's counsel cross-examined Sanli at length regarding the comparable sales, and any issue related thereto went to the weight of his testimony rather than its admissibility. (*Reardon, supra,* 4 Cal.3d at p. 512.)

## C

■ The Agency contends Sanli's testimony was excludable on the alternate ground he improperly included tangible assets in the comparable sales he relied on to determine the multiplier of five in the "cash flow multiplier" valuation approach. The Attishas assert the Agency may not raise an issue on appeal because it did not appeal the judgment. A respondent may, however, without appealing the judgment, ask us to review a ruling "for the purpose of determining whether . . . the appellant was prejudiced by the error or errors upon which he [or she] relies for reversal." (§ 906.)

The Agency relies on language from *People ex rel. Dept. of Transportation v. Muller, supra,* 36 Cal.3d 263, that "[g]oodwill may be measured by the capitalized value of the net income or profits of a business or by some similar method of calculating the present value of anticipated profits," but "[g]oodwill must, of course, be measured by a method which excludes the value of tangible assets or the normal return on those assets." (*Id.* at p. 271 & fn. 7.)

Under Sanli's "cash flow multiplier" approach, adjusted annual profit is multiplied by the number of years within which a purchaser would expect to recoup the purchase price (the multiplier). Sanli chose a multiplier of five years, based on multipliers appearing in several comparable sales after 1997 for small businesses he researched on Bizcomps and Pratt's Stats, computer databases. Sanli admitted the comparable sale amounts included inventory as well as goodwill, and as to one of the comparable sales he calculated the multiplier as 3.54 when inventory was included, and 2.5 when inventory was excluded. Sanli relied on the higher number.

It is unclear whether the trial court relied on this issue in excluding Sanli's testimony. The court, in "trying to think of other points of [Sanli's] testimony," ambiguously stated, "[t]here is a fault in the way he deducted out certain things at the end of his valuation process that [the Agency's counsel] has already pointed out squeezes the number." There is no indication the court felt this issue, standing alone, justified the striking of Sanli's testimony. In any event, we are not required to decide whether his selection of a multiplier for his "cash flow multiplier" valuation method was improper, because even if so, it did not warrant the wholesale striking of his testimony. Sanli used two valuation methods, including a "capitalized excess earnings" method that deducted the fair return on capital assets. The Agency did *not* challenge that method. Moreover, the Agency thoroughly cross-examined Sanli on this issue, and a jury is competent to weigh that evidence.

## D

Additionally, the Agency contends Sanli's testimony was excludable on the alternative ground the Attishas failed to comply with statutory requirements for the exchange of expert witness valuation data. The Agency cites section 1258.280, which provides that over an objection, "no party required to serve statements of valuation data on the objecting party may call a witness to testify on direct examination during [its] case in chief to his [or her] opinion on any matter listed in Section 1258.250 unless a statement of valuation data for such witness was served." (§ 1258.280, subd. (b).) Section 1258.250 requires an exchange of expert witness valuation data on the property being taken, including goodwill. (*City of Fresno v. Harrison* (1984) 154 Cal.App.3d 296, 302 [201 Cal.Rptr. 219].) " 'The discovery statutes are intended to safeguard against surprise.' [Citation.] 'The rules of discovery contemplate a two-way disclosure and do not envision that one party may sit back in idleness and savor the fruits which his adversary has cultivated and harvested in diligence and industry. Mutual exchange of data provides some protection against attempted one-way disclosure; the party seeking discovery must be ready and willing to make an equitable exchange. [Citations.]' " (*Id.* at p. 301.)

It is undisputed that the Attishas provided the Agency with Sanli's original statement of valuation data in a timely matter. The document stated that under Sanli's "cash flow multiplier" and "capitalized excess earnings" valuation methods, Valu-Mart's goodwill losses were $843,700 and $971,800, respectively. Sanli chose a value of $907,800.

It appears from the record that in his calculations Sanli originally allocated $76,000 for Valu-Mart's equipment and fixtures, but after his December 2002 deposition he learned the Agency's appraiser valued those items at $94,770.

Sanli also learned in early May 2003 from the Attishas' attorney that Valu-Mart was 6,000 square feet instead of 7,000 square feet, as the appraiser initially advised Sanli. Sanli revised his valuations in light of this information, and the Attishas faxed the Agency revised schedules on May 5, 2003, before jury selection.

At trial, Sanli testified that under the "cash flow multiplier" and "capitalized excess earnings" valuation approaches, Valu-Mart sustained goodwill losses of $870,000 and $1,008,700, respectively. He averaged the figures to arrive at a value of $940,000. The Agency made no objection to this testimony, although it varied from Sanli's statement of valuation data. During cross-examination, the Agency's counsel questioned Sanli regarding the changes in his valuations and whether he submitted a revised statement of valuation data, but the Agency again raised no objection to his testimony on the higher numbers.

After Sanli was excused, the Agency filed its written motion to strike his testimony, based principally on its argument *Handlery* precludes Sanli from assuming the Valu-Mart lease would be extended beyond the remaining seven-year term. As an additional ground the Agency cursorily argued "Sanli's ultimate opinion of value that he testified to at trial was a different number than he submitted in the Statement of Valuation Data required to be exchanged."

The Agency asserts the trial court based its exclusion of Sanli's testimony, in part, on the ground of section 1258.280, but the record does not support the assertion. In response to the Agency's written motion to strike Sanli's testimony, the Attishas submitted a declaration by Sanli, in which he defended his assumption the lease would continue into the foreseeable future, but also ambiguously suggested that even if he assumed the lease would not be extended beyond its remaining term, his goodwill valuation data would remain the same. The Attishas made an offer of proof that assuming the lease would not last beyond the remaining seven years "does not cause . . . Sanli to change his ultimate value opinion."

The court found Sanli's declaration lacked foundation because it did not "set forth with sufficient particularity how [Sanli's] ultimate valuation amount would not change if [he], in fact, assumed a lease that was to last just to the end of its term plus the options." The court further said, "I don't see how [Sanli] can say that on May 12 [in his declaration] when it's contrary to the testimony that he offered on May 8th and [does not] comply with the sections of the [Code of Civil Procedure] that require[] that the expert's exchanges be before the middle of trial on something that is as important as the length of the lease. . . ." Perhaps the court excluded Sanli's *declaration* for failure to

comply with the discovery statutes, but there is no suggestion it based its exclusion of his actual *testimony* on the discovery statutes. The Agency's counsel argued "[for] the record" that the reason Sanli gave for recalculating goodwill losses after his deposition "was not the truth," but the court gave no indication it relied on that argument.

In our view, the Agency waived the trial court's consideration of the argument by not objecting to Sanli's testimony in a timely manner. Section 1258.280 provides that "*upon objection of a party* who has served [its] list of expert witnesses and statements of valuation data in compliance with Section 1258.230" (italics added), "no party required to serve statements of valuation data on the objecting party *may call a witness to testify* . . . to his [or her] opinion on any matter listed in Section 1258.250 unless a statement of valuation data for such witness was served." (§ 1258.280, subd. (b), italics added.) We doubt the Legislature intended this language to mean a party may sit on his or her rights during an expert's testimony, and then move to strike the testimony in toto after the expert has been excused. The Agency knew of the change in Sanli's valuations before he was called to testify, and it gave no reason for its failure to object earlier. Had the Agency made a timely objection, the Attishas would have had an opportunity, at the least, to rely on Sanli's original statement of valuation data.

At any rate, the Agency did not argue or show it suffered any prejudice as a result of any discovery statute violation. (*Padre Dam Mun. Water Dist. v. Burkhardt* (1995) 38 Cal.App.4th 988, 994 [45 Cal.Rptr.2d 506].) There is no suggestion the lack of a revised statement of valuation data hampered the Agency's counsel. Rather, the record shows counsel vigorously cross-examined Sanli on both his original and later goodwill valuations and the reasons for the changes. Under all the circumstances, we conclude the discovery statutes do not provide an alternate ground for the striking of Sanli's testimony.

IV

*Exclusion of Valu-Mart Owner Bahira Attisha's Goodwill Valuation Testimony*

The Attishas cursorily assert the trial court erred by excluding Bahira Attisha's proffered testimony regarding goodwill valuation. They submit that "based on what she knew or had learned from various sources about the grocery store industry in general and her neighborhood in particular, [she] opined that the value of her business (i.e., the goodwill) was $1.3 million or more."

The Attishas rely on *Long Beach City H. S. Dist. v. Stewart* (1947) 30 Cal.2d 763, 773 [185 P.2d 585], in which the California Supreme Court held the lower court erred by not allowing a property owner to testify as to the reasons for his opinion as to the value of his property. That case, however, does not concern an owner's testimony on goodwill valuation.

■ We agree with the court's assessment that Bahira Attisha's proposed testimony lacked foundation, as it was based on nothing more than informal discussions with brokers whose names she could not recall and a few store owners. There was no showing she had any expertise in any of the various methods of valuing goodwill. In any event, the Attishas did not designate her as an expert witness, and her testimony was excludable on that ground. "The [disclosure] requirements imposed by section 1258.250 apply both to expert appraisers retained by parties and to property owners who testify as to value. . . . 'Section 1258.250 requires that a statement of valuation data be provided for each person who is to testify to his [or her] opinion as to one or more of the matters listed in the section whether or not that person is to qualify as an expert.' " (*Padre Dam Mun. Water Dist. v. Burkhardt, supra,* 38 Cal.App.4th at p. 992.)

V

*Disallowance of Compensation for Inventory*

Additionally, the Attishas contend the trial court erred by finding they are not entitled to compensation for inventory allegedly lost as a result of the condemnation. The inventory consisted largely of liquor, but also of tobacco products, soft drinks, groceries and supplies.

■ If an agency "takes or damages personal property in the exercise of its power of eminent domain, it is obligated to pay just compensation to the owner." (*Baldwin Park Redevelopment Agency v. Irving* (1984) 156 Cal.App.3d 428, 435 [202 Cal.Rptr. 792] (*Baldwin Park*). "Personal property (i.e., removable property) is not compensable . . . . Presumably, it will, or should be, removed by its owner when the realty is acquired [citation] and is thus not 'taken' by the public entity when it condemns real property [of] a business. . . . Business inventory may be compensable under limited circumstances, i.e., where the loss results from the condemnatory act itself (e.g., the inventory cannot be relocated) rather than the personal circumstances of the condemnee (e.g., the owner has decided that he will not relocate)." (*Chhour v. Community Redevelopment Agency, supra,* 46 Cal.App.4th at p. 283.)

The Attishas originally designated Vincent Attisha, the son of one of the Attisha couples, to testify as to the value of Valu-Mart's inventory from lists

of inventory prepared by third parties when the business closed. The Agency designated Desmond to address inventory issues. In a declaration, he stated "it is my opinion that there is no loss or damage to inventory." The Attishas later withdrew their designation of Vincent Attisha as a valuation witness.[7]

The Agency made a motion in limine to exclude testimony from defense witnesses related to compensation for business inventory. The Agency argued "Valu-Mart's inventory which [Attishas] are claiming . . . consists of alcoholic beverages with very few perishables. These are movable goods that could have been sold off at auction, sold at a 'going out of business sale,' or returned to the distributor that sold the goods to the [Attishas]. Additionally, the goods are being stored at the expense of [the Agency]. In any event, [the Attishas'] alleged inventory loss is not compensable because [their] personal circumstances rather than the condemnatory act itself in fact caused the alleged loss."

At the hearing, the Attishas argued that under *Baldwin Park, supra,* 156 Cal.App.3d at page 434, since Valu-Mart could not be relocated, they were essentially automatically entitled to the value of any inventory on hand when it closed. In *Baldwin Park,* the owner of an auto wrecking and parts business sought compensation for lost inventory, consisting of "some 400 vehicles in various stages of disrepair" and their component parts. (*Ibid.*) The trial court granted the agency's motion to exclude evidence of the inventory's value, and the appellate court reversed the ruling. The evidence showed the business could not be relocated and the owner was required to sell the inventory for scrap value. Further, "[s]ometime after the condemnation proceedings were commenced, the [a]gency warned [the owner] that if the inventory was not disposed of, it would charge back to the business the cost of removing the automobiles and parts from the premises." (*Ibid.*) The court held that "since the condemnatory act in and of itself resulted in the devaluation of her stock in trade, she is entitled to be compensated for the loss of the property in question." (*Ibid.*)

The trial court found that notwithstanding the impossibility of moving, the Attishas were required to mitigate damages to the extent possible. On appeal, they do not quarrel with the imposition of a mitigation requirement. Rather, they assert the matter should have gone to the jury. As discussed, however, in an eminent domain case, the trial court decides all issues of fact and mixed questions of fact and law, including entitlement to a specific category of damages. (*Emeryville, supra,* 101 Cal.App.4th at p. 1116.) Because the

---

[7] The Agency criticizes the Attishas for not including in its designation a claimed *value* for the inventory. We note, however, that the parties' joint trial readiness report stated the value of the inventory was *not* in dispute. In any event, the value is irrelevant as we conclude there was no entitlement to compensation for inventory.

evidence regarding inventory is undisputed, the trial court's finding is subject to our independent review. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 101 Cal.App.4th 1317, 1325 [125 Cal.Rptr.2d 1].)

The Attishas advised the court that Vincent Attisha and Lorens Attisha, also a son of one of the Attisha couples, "did most of the legwork" in dealing with the inventory. The Attishas' counsel, however, could not make an offer of proof because she was unaware of how Lorens or Vincent may testify regarding mitigation efforts. The court wanted to hear their testimony "to establish what was done to attempt to sell the merchandise," because "if it's capable of being resold and efforts have not been made to do so, it has not been lost" as a result of the condemnation.

The Attishas produced only Lorens Attisha.[8] He testified he was 21 years old and had worked at two family markets, Barney's and Valu-Mart, from the age of 14. His family designated him to try to sell Valu-Mart's inventory. He learned in August 2001 that Valu-Mart would be closing, and he began trying to sell the inventory in December 2002 when it became clear Valu-Mart could not be relocated. He had "plenty" of contacts in "the community" who owned liquor and grocery stores, and he contacted several of them and "told them that we have bulk inventory that we'd like to sell," and "if anybody knows anybody to come talk to us." He told these people he wanted $147,000 in cash, the cost of the inventory.[9] He also spoke with liquor and grocery salesmen who came into Valu-Mart. He "learned that everybody that was interested . . . in purchasing our inventory didn't have the money to purchase the bulk like that."

Lorens also testified he made "approximately 100 phone calls," or "so many that I can't even recall," up to shortly before trial. He further stated: "My father is a member of a country club [whose members] own several liquor stores, grocery stores, mini-marts, all in the same nature. I went to that club with my father several times. . . . I have sat with people and told them that we have this inventory for sale." He spoke with 40 to 50 club members and none wanted to purchase the inventory.

Lorens testified he had received offers of $15,000 and $23,000 for the inventory, but he rejected the offers because they were "pennies on the dollar." "[O]ther people wanted a case of this and a case of that," but he

---

[8] The Attishas incorrectly assert the Agency insisted they present Lorens Attisha's testimony. The trial court advised the Attishas' counsel to "figure out who's going to testify," and after a break counsel decided to produce Lorens and not Vincent Attisha or any other witness on the mitigation issue.

[9] The $147,000 included inventory from Barney's that was moved to Valu-Mart after Barney's was taken by eminent domain.

refused to sell it piecemeal. He would have, however, accepted offers for half, a third or a quarter of the inventory.

Lorens conceded he did not have a liquidation sale at Valu-Mart, because he assumed the Agency would grant him a three- to six-month extension of the March 4, 2002 possession date, based on an extension the Agency granted Barney's when it condemned that property. When he realized there would be no extension, he had inadequate time to hold a liquidation sale. He conceded the Agency did not advise him there would be any extension, and he did not list or advertise the inventory in the newspaper or any trade magazine because "I didn't think that it would be a place for someone to look for it."

This case is readily distinguishable from *Baldwin Park*, and we conclude the inventory is not a compensable element of the condemnation. The Attishas had no reasonable expectation of an extension of possession and they could have conducted a liquidation sale in a timely matter. Further, they did not market the inventory in a reasonable manner. For instance, there is no evidence they sought assistance from a third party with actual expertise in liquidating merchandise, and given the circumstances they should have been willing to discount the price of the inventory. Additionally, the Attishas maintained control over the inventory, and they produced no evidence it is unsalable because of liquor laws or expiration of sale dates on any perishable items. As the court noted, the Attishas received an offer shortly before trial, albeit a low one, and it is "reasonable to conclude that if sufficient efforts had been made . . . we would be talking about a . . . higher dollar figure and perhaps even something closer to the depreciated value."

## VI

### *Directed Verdict*

"A directed verdict is proper only when, after disregarding conflicting evidence and giving the opposing party's evidence every legitimate inference which may be drawn therefrom, there remains no evidence of sufficient substantiality to support a verdict in favor of the opposing party. [Citation.] Unless it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so lacking in evidentiary support that a reviewing court would be compelled to reverse on appeal, or a trial court to set it aside, the trial court is not justified in taking the issue from the jury." (*Aetna Life & Casualty Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 865, 876 [216 Cal.Rptr. 831].) Because the exclusion of Sanli's testimony was improper, the directed verdict in the amount of Desmond's valuation was also improper.

## DISPOSITION

The judgment is reversed insofar as it concerns valuation of goodwill, and the matter is remanded for a new trial on that issue. The judgment is affirmed in all other respects. The Attishas are awarded costs on appeal.

O'Rourke, J., and Aaron, J., concurred.

A petition for a rehearing was denied May 6, 2005, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied July 27, 2005.