Filed 5/15/15  Rivertree v. Reed Leasing Corp. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

RIVERTREE et al.,

       Plaintiffs, Cross-defendants and Respondents,

    v.

REED LEASING GROUP, LLC, et al.,

       Defendants, Cross-complainants and Appellants.

C072338

(Super. Ct. No. 39200800184356CUORSTK)

Plaintiffs Brent and Gerald Barton and defendants Wendell, Jeff, and Greg Reed, through their respective business entities, entered into an option agreement granting the Bartons the option to purchase a parcel of land upon specified terms and conditions.  A dispute arose between the parties and the Bartons filed suit, asserting breach of the option agreement.  The Reeds filed a cross-complaint for ejectment and unjust enrichment.  The trial court found in the Bartons' favor on their complaint and also granted their motion for summary judgment on the cross-complaint.  The Reeds appeal, arguing (1) judgment should not have been entered against various Reed entities, (2) the court erred in finding there were no modifications to the option agreement, (3) the court erred in finding that a

1

breach of the option agreement took place in September 2006, (4) the Bartons repudiated the option agreement, and (5) the court erred in denying the Reeds' request for a continuance. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Parties.** The Bartons are walnut farmers whose partnership, plaintiff Rivertree, was a signatory to the option agreement here in dispute. Rivertree assigned its interest in the option agreement to plaintiff Barton Family Limited Partnership (Barton Family Partnership).

Arrayed against the Bartons and their business entities are the Reeds and multiple entities controlled by them, including Reed Leasing Group, LLC (Reed Leasing), which granted the option, Basic Resources, Inc. (Basic Resources), and Aggregates, Inc. (Aggregates), a corporation owned by Basic Resources. Aggregates at one time owned property adjacent to the property subject to the option agreement, but in 2005 it transferred its interest in the property to Reed Family Vineyards, LLC. The planned use of the adjacent property is a factor in the current dispute.

**The Subject Property.** In 1999 the Bartons learned one of their neighbors, Ward Rumble, wanted to sell his 81.5-acre parcel (the Rumble property), which bordered on the Bartons' two walnut ranches. The Bartons made an offer to Rumble, but Rumble instead contracted to sell the property to defendant Aggregates, which wanted to mine it for sand and gravel.

After learning of their unsuccessful bid, Gerald and Brent Barton approached Wendell Reed to discuss an arrangement by which Reed would mine the property and, following the cessation of mining and restoration to farmland, the Bartons would farm the property. Wendell Reed suggested an option agreement giving the Bartons the right to purchase the property after Reed had extracted the available sand and gravel.

**The Option Agreement.** The Bartons and the Reeds agreed to an option, under which Basic Resources, or one of its subsidiaries, would mine the Rumble property and

then restore it "using best approved methods of restoration." After the restoration the Bartons would have the option to purchase the property for $7,050 per acre.

On November 8, 1999, Aggregates and Rivertree entered into an option and sale of real property agreement (the 1999 option agreement). In consideration of the option to purchase the Rumble property, Rivertree paid $100. Rivertree also agreed to help Aggregates obtain a mining permit. Aggregates agreed to restore the land to suitable farming condition after the mining process. Rivertree had one year from the end of mining and restoration, estimated at 11 years, in which to exercise the option. The 1999 option agreement stated that any amendments must be in writing and signed by all parties.

Aggregates never acquired title to the Rumble property. Instead, another Reed entity, Reed Leasing, acquired the property from Ward Rumble. Rivertree and Reed Leasing executed a new option agreement on March 2, 2000 (the option agreement). The terms of this option agreement mirrored those of the 1999 option agreement; Reed Leasing simply replaced Aggregates as the contracting party. In February 2006 Rivertree assigned its rights under the option agreement to Barton Family Partnership.

**The Mining Process.** Shortly after acquiring the Rumble property, defendants began to mine the sand and gravel. The mining process proceeded much more quickly than anticipated, and it became apparent that mining would be completed by the end of 2005.

**Lot Line Adjustment.** By September 2005 Jeff Reed had taken over management of Basic Resources from his father, Wendell Reed. Jeff Reed was also a director of Aggregates and a manager of both Reed Leasing and Reed Family Vineyards. Jeff and Wendell Reed met with Gerald and Brent Barton to discuss the option agreement in September 2005. During the meeting, Jeff Reed told the Bartons that defendants had carved out, by lot line adjustment, two acres from the southeast corner of the Rumble property.

Jeff Reed planned to combine the two acres taken from the Rumble property with a portion of a neighboring parcel on which the Reeds had a right of first refusal (the Christensen parcel) to create a five-acre homesite parcel. Title to the Christensen parcel, over which ran an access easement serving the Rumble property, was held by Aggregates. In 2005 title was transferred to Reed Family Vineyards.

Rivertree had not agreed to the lot line adjustment. The removal of the two-acre parcel had an impact on the Rumble property. The existing easement over the Christensen parcel would run directly through the five-acre homesite parcel, which would create problems for the movement of farm equipment to the Rumble property. The Bartons raised these concerns in a meeting between the parties.

Though the Bartons were surprised that the Reeds had transferred the two acres from the Rumble property without their consent, they did not object and, in an effort to cooperate, proposed a solution to the easement problem. The Bartons proposed eliminating the existing easement near the southern boundary of the Christensen parcel and creating a new easement at the north boundary of the property. They also suggested the Reeds draw up a new legal description and that the parties amend the option agreement once the description was prepared. However, no written amendment to the option agreement was ever executed or drafted.

**The Barley Crop.** During the same meeting, the Bartons expressed a desire to plant a new barley crop on the property to determine the effect of the mining and reclamation on the soil. After mining, methane pockets can build up in the soil and a test crop, such as barley, allows a farmer to pinpoint the location and ascertain the severity of such deposits. The Bartons planned to exercise the option agreement after the harvest of the barley crop, unless there were significant methane problems revealed by the barley crop.

Initially, both parties believed the option agreement needed to be exercised within six months after the Reeds' completion of the restoration process, so the Bartons

4

requested, and Jeff Reed granted, an extension of time to exercise the option agreement in order to allow the barley crop to grow. However, the parties later determined the option agreement required exercise within one year of completion of the restoration and no extension was necessary.

In September 2005 Jeff Reed gave the Bartons permission to plant the barley crop. Mining operations and restoration were completed by November 2005. The Bartons harvested the barley crop in late June 2006.

**Easement Issues.** In January or February 2006 Jeff Reed and Brent Barton met again and discussed the easement issues. Brent Barton understood that the parties had agreed to leave the legal easement on the south border of the Rumble property, but to allow the Bartons to use an existing road, the haul road, which ran through the middle of the Christensen parcel. In the future, if the parties wanted to change the location of the south easement, they would move it to a mutually acceptable path. Brent Barton confirmed this understanding in an e-mail to Jeff Reed dated February 14, 2006.

In a letter dated July 21, 2006, the Bartons set forth details about the issues remaining to be resolved before the close of escrow, including the two-acre parcel taken out of the Rumble property by the lot line adjustment. The Bartons did not object in principle to the lot line adjustment and proposed that a new legal description be prepared and the option agreement be amended.

In August 2006, without informing the Bartons, Jeff Reed abandoned the south easement and created a new easement along the northern boundary of the Christensen parcel (north easement). The Reeds failed to obtain prior approval from the county for a driveway onto the adjacent public road, meaning vehicles could not drive from the north easement onto the public road, making the north easement useless. Also, the north easement did not provide enough space for equipment or vehicles to access the Rumble property because of a sharp corner along the route. There was no consultation between

5

the parties regarding a mutually agreeable path.  It appeared that Jeff Reed simply disregarded the Bartons' concerns and needs in creating the north easement.

**Subsequent Events.**  On August 14, 2006, having received no response to their July 21, 2006, letter, the Bartons' counsel, Wilmar Jensen, contacted Jeff Reed.  Jeff Reed responded that while the two acre lot line adjustment had been approved, the deeds transferring the two acres to the Christensen parcel and transferring the Christensen parcel from Aggregates to Reed Family Vineyards had not been recorded.  However, in an e-mail dated August 14, 2006, Jeff Reed stated he hoped to have things "ready by the end of the week."  On August 31, 2006, Jensen made further inquiry, and Jeff Reed requested an extension until September 15, 2006, to complete the transfers.

The trial court found the Bartons exercised their option by letter on July 21, 2006.  Under the terms of the option agreement, escrow should have closed by September 19, 2006, within 60 days after the exercise.  Escrow did not close by that date.  Four months after the deadline, on Januarry 19, 2007, the Bartons received word that Jeff Welch, a Basic Resources employee, would reopen escrow.

During the delay, the Bartons, expecting that the property would soon be transferred, prepared the land for walnut planting in the fall of 2006.  In January 2007 the Bartons planted walnut trees on the Rumble property and had cared for them ever since.

Welch prepared the documentation related to the lot line adjustment.  Welch also prepared the escrow instructions.  On April 23 Brent Barton made a capital call to the partners of the Barton Family Partnership, and funding was in place by April 30, 2007.  Gerald and Brent Barton signed the escrow papers on May 1, 2007.  Jeff Reed acknowledged receipt of the signed escrow papers but refused to sign them.

**The Litigation Begins.**  In May 2008 Rivertree filed a complaint for breach of the option agreement.  Defendants filed their demurrer and a motion to strike portions of the complaint.  The court sustained the demurrer with leave to amend and found the motion to strike moot.  In August 2008 Rivertree filed a first amended complaint.  The court

sustained defendants' demurrer to the third and fourth causes of action with leave to amend.

In November 2008 Rivertree filed a second amended complaint. The court denied defendants' motion to strike portions of the second amended complaint. Defendants filed an answer and Reed Leasing filed an unverified cross-complaint for ejectment and unjust enrichment.

Defendants Reed Leasing, Reed Family Vineyards, Basic Resources, and Aggregates filed a motion for judgment on the pleadings. The court denied the motion. The same defendants subsequently filed a motion for summary judgment, which the court also denied.

Rivertree filed a motion to bifurcate equitable issues at trial. The court granted the motion and limited the first phase of trial to issues in the second amended complaint and the second phase of trial to issues in the cross-complaint.

Following a court trial, the court issued a tentative decision against defendants. After defendants requested a statement of decision, the trial court complied.

Rivertree filed a motion for summary judgment on the cross-complaint. The court granted the motion. Following entry of judgment, defendants filed a timely notice of appeal.

## DISCUSSION

### Judgment on the Pleadings

Defendants argue that Reed Family Vineyards, Basic Resources, and Aggregates were not signatories to the option agreement, and therefore judgment should not have been entered against them. These defendants filed a motion for judgment on the pleadings as to Rivertree's causes of action for declaratory relief and specific performance. Defendants argued they could not be subject to causes of action based on the option agreement because they were not subject to or party to the option agreement.

7

The court denied the motion, finding the complaint alleged sufficient facts to state causes of action against all defendants.

We review de novo an order denying a motion for judgment on the pleadings. Our review is limited to the face of the pleading, and we assume all facts alleged therein are true. (*Caldera Pharmaceuticals, Inc. v. Regents of University of California* (2012) 205 Cal.App.4th 338, 349.)

Defendants contend the court denied the motion "based on the existence of a boilerplate 'agency' allegation found within the Second Amended Complaint." Rivertree's second amended complaint alleged that all defendants were agents for the other defendants and acted on behalf of all other defendants. All of the actions allegedly taken, including the execution of the option agreement, were alleged against all defendants.

Labeling such allegations as "boilerplate" does not undermine their sufficiency. A general averment of agency is ordinarily sufficient. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 920, pp. 333-334.) Defendants cite to no authority requiring that agency be specifically alleged in this instance. Taking the allegations in the complaint as true, the second amended complaint states facts sufficient to state a cause of action against each defendant, including Aggregates, Basic Resources, and Reed Family Vineyards, and the trial court did not err in denying defendants' motion for judgment on the pleadings.

## Motion for Summary Judgment

The same defendants filed a motion for summary judgment, requesting they be dismissed from the action because they had no legal interest in the property and were not acting as agent on behalf of Reed Leasing. The trial court denied the motion. The court found there were triable issues of fact as to which defendants held equitable or legal interest in the Rumble property and as to the existence of an agency relationship between employees of Reed Leasing and defendants.

8

A motion for summary judgment must be granted if the submitted papers show there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 844.) The moving party, whether plaintiff or defendant, initially bears the burden of making a "prima facie showing of the nonexistence of any genuine issue of material fact." (*Id*. at p. 845.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id*. at p. 851.) "Thus, if a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would require a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment as a matter of law, but would have to present his evidence to a trier of fact." (*Ibid*., italics omitted.) Once the moving party has met its burden, the burden shifts to the opposing party to show the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subds. (a), (p)(2).)

We review de novo the record and the determination of the trial court. First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts negating the opponent's claims and justifying a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable issue of fact. (*Barclay v. Jesse M. Lange Distributor, Inc.* (2005) 129 Cal.App.4th 281, 290.)

Defendants argue the trial court's reasoning was "legally unsound," contending the agency allegation in the complaint is unsupported by any evidence and defendants had no legal interest in the Rumble property.

Defendants stated that Basic Resources, Aggregates, and Reed Family Vineyards had no interest in the property bearing assessor's parcel number (APN) 249-070-021.

9

However, this number refers to the Rumble property when the option agreement was first executed.  After the lot line adjustment, the Rumble property was assigned two new numbers, one for the homesite and the other for the remaining acreage.  The fact that defendants had no interest in the property bearing the original APN did not prove they had no interest in the property subject to the option agreement.

In supporting the motion, defendants also contended that none of the other Reed entities were in touch with Rivertree or the Barton Family Partnership, and none were acting as an agent of Reed Leasing.  However, Aggregates executed the original option agreement with Rivertree in 1999.  In 2000 the new option agreement was executed between Reed Leasing and Rivertree.  Documents concerning the lot line adjustment were prepared by Basic Resources employee Jeff Welch.  Welch contacted the title company to open escrow after the Bartons exercised the option; he also prepared the escrow instructions.  In addition, Basic Resources is the parent company of Aggregates, which held title to the Christensen parcel before transferring it to Reed Family Vineyards.

We find that triable issues of material fact existed as to defendants' involvement in the transaction.  The trial court did not err in denying defendants' motion for summary judgment.

### Motion for Judgment During Trial

Following Rivertree's case-in-chief, defendants brought a motion for judgment, arguing in part that no evidence had been presented against them.  The trial court denied the motion.  The court found that, at that point in the proceedings, it was not sure exactly what the relationships were between the various entities.  The court needed to hear from defendants before deciding whether they should be included in the litigation.

According to defendants, "The entire purpose of a Motion for Judgment is for a Trial Court to weigh whether plaintiff has put forward a sufficient case.  The non-signatory defendants moved for judgment because no legally recognizable claim was brought against them nor substantiated during plaintiff's case in chief.  It was plaintiffs'

10

burden to explain why they were suing each party and they failed to do so as to three of the defendants. The court violated the purpose and intent of Code of Civil Procedure section 631.8(a) which allows for a motion for judgment after a party has closed its case in chief if said party fails to substantiate a claim against another party."

In reviewing a court's ruling on a motion for judgment, the trial court's findings are accorded the same weight as though they had been made after a trial and a full presentation of the evidence. We view the evidence in the light most favorable to the party prevailing at trial. (*Allegretti & Co. v. County of Imperial* (2006) 138 Cal.App.4th 1261, 1269; *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528.)

Here, the trial court faced a cornucopia of entities involved in the transaction in dispute. A trio of defendants argued it was not involved in the option agreement and had no interest in the Rumble property. Given the web of relationships among the various defendants and the complexity of the negotiations and events surrounding the exercise of the option agreement, it seems eminently practical and wise for the trial court to have waited until the conclusion of evidence to determine whether those defendants should remain in the litigation. In ruling on a motion for judgment during trial, the court, as trier of fact, weighs the evidence and may render a judgment in favor of the moving party. (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549-550.) In the present case, the trial court weighed the evidence presented and found it wanting. We find no error in the trial court's denial of defendants' motion for judgment made midway through trial.

**The Trial Court's Judgment**

Defendants contend the court erred in failing to recognize and give effect to four material and substantial modifications to the option agreement, as follows:

1. The Lot Line Adjustment. Following the execution of the option agreement in 2000, defendants informed the Bartons of the lot line adjustment in 2005. The Bartons responded in a September 2005 letter, noting that an attachment to the option agreement

11

described 81.5 acres, not the 79.5 acres resulting from the adjustment. The Bartons also raised the issue in a letter in 2006, again expressing their willingness to amend the option agreement to reflect the lot line adjustment. The record does not reveal, and defendants do not cite, any written amendment to the option agreement revising the description of the acreage.

2 The Planting of the Barley Crop. Defendants also contend that their permitting the Bartons to plant and harvest a barley crop on the Rumble property constituted a modification of the option agreement. According to defendants, "The barley crop issue is tied in with the lot line adjustment as it was part of the consideration provided to the Bartons in exchange for their agreement not to contest the lot line adjustment." Defendants argue, "Brent Barton admitted they were not entitled to the two acres [under the lot line adjustment]. More importantly, the evidence presented at trial demonstrates there were documents reflecting the parties' agreement regarding the lot line adjustment. The Bartons obtained the benefit of the modification by planting the barley crop but now claim they do not have to perform their obligations and relinquish the two acres."

3. Alteration of Drainage. Defendants argue the discussions of the drainage problems on the Rumble property modified the option agreement. According to defendants: "The Bartons requested a material and substantial change by asking that the drainage direction of the property be altered."

Under the option agreement, Reed Leasing was required to restore the property after completion of mining activities, including drainage. Defendants note the parties discussed the issue of drainage at a meeting in 2005 and in correspondence and e-mails in 2006 and 2007.

4. Creation of North Easement. Finally, defendants claim the option agreement was modified to include an access easement on the north boundary of the Christensen parcel to replace the prior access easement near the southern boundary.

12

Defendants argue the Bartons demanded an easement on the northern boundary as a condition for purchasing the Rumble property.

***Standard of Review***

Defendants argue we review the trial court's judgment de novo, since the court's finding on modification was "pure legal error." According to defendants, the judgment is not based on disputed facts and "[t]here is only disagreement as to the legal effects of the parties' correspondence and conduct." Not exactly.

The court found defendants breached the option agreement, and therefore Rivertree was entitled to specific performance. We review a grant or denial of specific performance under the abuse of discretion standard. (*Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472.)

Nor are the errors alleged by defendants purely legal issues requiring that we review them de novo. During trial, the court considered a myriad of factual issues and found: "The evidence presented established that the Bartons have conducted themselves throughout their dealings with defendants with the utmost integrity and honesty. Throughout the process from the execution of the Option in March 2000 to exercise of the Option in July 2006, and until the relationship broke down in August of 2007, the Bartons tried to find common ground and solutions to the issues and problems created by defendants. The Bartons have attempted to resolve disputes in a mutually acceptable manner and have consistently tried to avoid problems through communication. Additionally, the documentary evidence presented by the Bartons tended to support their testimonial evidence and *vice versa*. The testimony of Gerald Barton, Brent Barton and Raymond Smith was credible and persuasive.

"In contrast, the evidence presented by defendants' [*sic*] was not credible. It was inconsistent with the documentary evidence admitted at trial or in some instances, was undermined by the lack of documentary support. Further, key witnesses for defendants – Jeff Reed and Jeff Welch in particular – gave testimony that was not believable or, at

13

least, was uninformed or mistaken on key points. Overall defendants' credibility was seriously compromised. Defendants presented little actual evidence to support either their positions or their demonizing of the Bartons."

***The Trial Court's Findings***

Following the trial, the court determined the option agreement was definite and clear in its terms, mandating Reed Leasing convey the Rumble property to the Barton Family Partnership within 60 days after the exercise of the option agreement in exchange for the purchase price stated in the agreement. In addition, as to any modification of the option agreement, the court found: "After execution, the Option was the subject of discussions about possible amendment or modification. However, no written amendment or modification was ever executed as required by the Option. The Option provides that: '[t]his agreement may not be modified, altered, or amended except by a writing signed by all parties hereto.' [Citation.] There was no writing signed by all parties to the Option removing the two acres or moving the easement. Thus, there was no modification or amendment of the Option. Furthermore, the parties' subsequent discussions did not render the Option uncertain. [Citation.]."

Civil Code section 1698, which governs the modification of a written contract, states: "(a) A contract in writing may be modified by a contract in writing.

"(b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.

"(c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provisions.

"(d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement,

14

rescission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts."

*Analysis*

Defendants argue the court's finding on modification was erroneous and unsupported by the record. To the contrary, there is no evidence that the option agreement was modified in the manner suggested by defendants.

As to the lot line adjustment, following the execution of the option agreement in 2000 defendants informed the Bartons of the lot line adjustment in 2005. The Bartons responded in a September 2005 letter, noting an attachment to the option agreement described 81.5 acres, not the 79.5 acres resulting from the adjustment. Accordingly, the letter states: "Upon learning of your intention earlier this summer, we have honored your wishes. A revised legal description will be needed to amend the option agreement." The Bartons also raised the issue in a letter in 2006, again expressing their willingness to amend the option agreement to reflect the lot line adjustment, stating: "there does not seem to be any discussion in the Option with relation to the retention of the home site which consisted of approximately 2 acres. That parcel should be described and excluded from this Option." The record does not reveal, and defendants do not cite, any written amendment to the option agreement revising the description of the acreage. The effort of defendants to tie the planting of the barley crop to the lot line revision also fails. It is true that defendants orally gave permission to the Bartons to plant and harvest the crop. However, there is no written agreement signed by the parties memorializing this agreement and tying it to the option agreement.

Substantial evidence supports the trial court's finding that, despite discussions about possible amendment, no written modification exists concerning the lot line adjustment.

In addition, the parties discussed the issue of drainage. Plaintiffs disputed that defendants complied with their obligations with respect to drainage, but plaintiffs

15

nonetheless proceeded with escrow despite the disagreement and defendants thereafter contributed to the cost of needed drainage work. There is no evidence of a written modification of the option agreement respecting drainage. Nor is there any evidence of modification with respect to easements. Under Civil Code section 1698, subdivision (b), a written agreement may be modified by an oral agreement "to the extent that the oral agreement is executed by the parties." Here, the easement on the northern boundary was never conveyed to the Bartons. Since there was no execution of the alleged oral agreement to create an easement on the northern boundary, the written agreement was not so modified.

### Timing of the Breach

Defendants also challenge the trial court's finding that the option agreement was breached in September 2006. According to defendants, the alleged modifications were the reason escrow could not close in September 2006: "As a matter of law, plaintiffs' requests for changes constituted a waiver of the condition that escrow close in September since their own actions rendered such performance impossible." Defendants also argue the Bartons failed to tender performance at that time, nor did they demand performance.

The trial court found the Bartons timely exercised their option under the option agreement by letter on July 21, 2006. Therefore, under the terms of the option agreement, escrow should have closed by September 19, 2006, 60 days after the exercise. Since escrow did not close, the court found this failure a material breach of the option agreement by defendants.

The Bartons in the July 21, 2006, letter unconditionally exercised their option. The letter states: "On behalf of Rivertree and the Barton Family Limited Partnership, the undersigned hereby exercise that Option contained in that certain Option and Sale of Real Property Agreement, dated March 2, 2000, by and between the Reed Leasing Group, LLC and Rivertree, a California general partnership." The letter also provides the APN and attaches a legal description of the property.

16

In a second letter, dated that same day, the Bartons listed the issues remaining to be resolved before escrow closed. Defendants did not close escrow on September 19, 2006. Instead, Jeff Welch, an employee of Basic Resources, contacted Brent Barton on January 19, 2007, and told him escrow would be opened. The Bartons, expecting the transfer of the Rumble property shortly, planted the walnut orchard. Jeff Welch prepared the escrow instructions, and in April 2007 everything seemed to be in order to close escrow. The Bartons transferred the funds necessary to purchase the Rumble property in April 2007, and on May 1, 2007, Gerald and Brent Barton signed the escrow papers. Jeff Reed refused to sign the escrow papers and return them to the title company for recording.

We have considered defendants' claims that a variety of activities constituted modifications of the option agreement and found them wanting. There were no modifications of the option agreement, either in writing or by mutual performance of a subsequent oral agreement. Therefore, there was no waiver of the condition that escrow close in September 2006.

At trial, defendants argued the exercise did not conform to the terms of the option agreement because of the accompanying cover letter. However, the court found the Bartons' exercise of the option was "unequivocal and conformed to the terms of the Option. [Citation.] Furthermore, defendants did not raise this purported objection to plaintiffs' exercise until the middle of trial; thus, they have waived any claim that plaintiffs' exercise was invalid. [Citation.]

"No evidence was presented to support a defense of laches. Plaintiffs did not unreasonably delay in prosecuting this action and there was no evidence of any prejudice to defendants as a result of any delay."

Defendants contend there is nothing in the record that reveals the Bartons demanded performance of the option agreement in September 2006. We disagree. The July 21, 2006, letter clearly and unambiguously exercised the option agreement.

*Repudiation of Option Agreement*

Defendants contend the Bartons repudiated the option agreement. In essence, defendants argue the Bartons breached or repudiated each of the modifications discussed, *ante*. At trial, defendants argued the equitable remedy of specific performance should not be granted because the Bartons had unclean hands, similar to the argument of repudiation made on appeal.

The trial court rejected this contention, finding: "Not only was there no evidence presented that plaintiffs acted inequitably towards defendants, the evidence presented instead established that defendants' hands were unclean. Thus, defendants have failed to establish the defense of unclean hands." We agree with the trial court's assessment. We find no repudiation by the Bartons concerning the alleged modifications to the option agreement.

## Motion to Continue

During trial, defendants filed a motion to continue trial, which the court denied. Defendants label the court's denial an abuse of discretion.

On April 22, 2011, defendants filed a motion to continue trial. Defendants requested the continuance because trial counsel Charles Brunn was recovering from the effects of heart surgery and would not be fully recovered until August 2011. The court denied the motion but stated it would limit the number of hours to accommodate Mr. Brunn's condition. Trial took place from June 22, 2011, through July 27, 2011.

We review the trial court's denial of a motion to continue the trial for an abuse of discretion. A trial court abuses its discretion when it exceeds the bounds of reason by making a determination that is arbitrary, capricious, or patently absurd. (*Lazarus v. Titmus* (1998) 64 Cal.App.4th 1242, 1249; *In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)

Defendants point to the court's comments in denying the motion. The court stated: "Mr. Brunn, with respect to it's gone on through several demurrers; motion for summary judgment; one, for sure, and maybe two. There's been a lot of motions brought

18

by the Defendant that have struck me as looking to delay the proceedings.  [¶] . . . [¶] . . . Now, I'm telling you how -- that's not just the motions to continue the trial, which were for legitimate reasons, Mr. Sahota at CMCs has resisted setting trial dates all along the ways."  Defendants contend the trial court denied the motion for a continuance based on its irritation at prior motions, which was not good cause.

However, the trial court acknowledged trial counsel's health needs and adjusted the trial schedule accordingly.  The court shortened the hours each day, beginning around 10:00 a.m. and concluding at 1:00 p.m. most days.  We find no abuse of discretion in the court's denial of the motion for a continuance.

## DISPOSITION

The judgment is affirmed.  The Bartons shall recover costs on appeal.

                                                                    RAYE          , P. J.

We concur:

          BLEASE          , J.

          DUARTE          , J.